JAMES M. YORK *et al.*, Plaintiffs-Appellees, v. ABDEL RAOUF
EL-GANZOURI *et al.*, Defendants-Appellants.

First District (1st Division)   Nos. 1—03—0222, 1—03—0259 cons.

Opinion filed September 30, 2004.

R. Dennis Rasor and Dianne L. Jennings, both of Anderson, Bennett & Partners, of Chicago, for appellant Rush Presbyterian-St. Luke's Medical Center.

Francis Raymond Petrek, Jr., and Krista R. Frick, both of Bollinger, Ruberry & Garvey, of Chicago, for other appellants.

Robert A. Clifford and Timothy S. Tomasik, both of Clifford Law Offices, and David A. Novoselsky and Leslie J. Rosen, both of Novoselsky Law Offices, both of Chicago, for appellees.

JUSTICE GORDON delivered the opinion of the court:

Defendants, Abdel Raouf El-Ganzouri, M.D., his anesthesiology practice group, University Anesthesiologists, S.C. (hereinafter collectively referred to as Dr. El-Ganzouri), and Rush Presbyterian-St. Luke's Medical Center (Rush), appeal from a $12,598,591 medical malpractice judgment entered against them and in favor of plaintiff, James York, M.D., pursuant to a jury's verdict. On appeal, Dr. El-Ganzouri contends that the trial court's time limitation on *voir dire*, and effective preclusion of the use of Dr. York's day-in-the-life video by the *voir dire* time restriction, precluded him from receiving a fair trial. He also contends that the trial court erred in allowing his expert witness to be impeached with Supreme Court Rule 213(g) (177 Ill. 2d R. 213(g)) interrogatory answers not signed by the expert. Finally, he contends that the trial court should have reduced Dr. York's damages for past medical expenses by the amounts already compensated for by his health insurance. Rush, in addition to adopting Dr. El-Ganzouri's

arguments, contends that the trial court should have granted its motion for directed verdict, and if not that motion, then its motion for judgment *non obstante verdicto*, or, at the very least, granted its request for a new trial because Dr. York proved neither that Rush held out Dr. El-Ganzouri as its agent nor that he sufficiently relied on Rush for his care for vicarious liability to attach. For all the reasons discussed below, we affirm as to both defendants.

## I. FACTUAL BACKGROUND[1]

Dr. James York was an orthopedic surgeon. He also led an active lifestyle outside of his work, running marathons, playing tennis, and providing free medical treatment in Africa through a church-sponsored program. However, athletics and aging led to knee problems for Dr. York requiring multiple surgeries. Dr. York always sought out the best surgeon for the procedures he required. Besides Chicago, Dr. York had traveled to Toronto, Canada, Pennsylvania, and Baltimore, Maryland, for knee surgeries.

On February 9, 1998, Dr. York was to undergo a cemented total knee arthroplasty in his left knee. This was to be his third surgery at Rush, all performed by his chosen surgeon, Dr. Rosenberg. Dr. El-Ganzouri and Dr. Miller, an anesthesiology resident at Rush at the time, came to perform a combined spinal epidural on Dr. York prior to the surgery.

In a combined spinal epidural procedure, a local anesthetic is first applied to the patient's back. This anesthetic prevents the patient from experiencing any pain when a large "Touhy" needle is inserted between the bones in the spine, but short of the spinal column itself. A finer "Whittaker" needle is then advanced through the Touhy needle. The Whittaker needle pierces the dura, a thick skin protecting an area known as the subarachnoid space which contains cerebral spinal fluid and the spinal cord itself. A doctor knows he has pierced the dura by feeling a pop, described at trial as akin to the feeling a user of a fork experiences when piercing the skin of a sausage. At that point, the anesthesiologist can confirm that he has accessed the subarachnoid space, and is ready to inject anesthesia, by aspirating cerebral spinal fluid. Needles are supposed to enter through the lumbar area of the spine, beneath the end of the spinal cord itself. The end of the spinal cord is known as the conus. By making the injection through the lumbar area, the anesthesiologist avoids the risk of

---

[1]Because the record is voluminous, for purposes of economy and organization, this section will provide only a brief, preliminary overview of the facts. A more detailed presentation of relevant facts will be presented in the context of our analysis of the legal issues for which they are relevant.

contacting the spinal cord, though he still faces the risk of striking a complex of nerves that hang from the conus like a horse's tail, and are thus known as the *cauda equina*. After the injection of the spinal anesthesia, an epidural catheter is placed through the same insertion point, but short of the subarachnoid space, allowing for ongoing administration of anesthesia as needed.

Something happened during Dr. York's combined spinal epidural. Twice, as Dr. El-Ganzouri inserted needles into his back, Dr. York expressed feeling pain. According to Dr. El-Ganzouri, they were fairly mild expressions; but, according to Dr. Miller, they were screams the likes of which he had never heard before. During one of the needle insertions, Dr. York's right thigh cramped and his right calf swelled. Dr. York subsequently went numb as the anesthetic took effect and underwent surgery.

After the knee surgery, Dr. York could not feel or move his right leg. He had lost bowel and bladder control, and experienced sexual dysfunction. Dr. York underwent an extensive course of rehabilitation, but only with partial success. His caregivers anticipated that his deficits would increase with age.

Dr. York and his wife filed a complaint against Dr. El-Ganzouri and University Anesthesiologists. They later amended the complaint to include Rush on the theory that Dr. El-Ganzouri was Rush's apparent agent at the time of his combined spinal epidural. Both defendants answered the complaints and discovery ensued.

The plaintiffs charged that Dr. El-Ganzouri breached the standard of care for anesthesiologists by inserting the spinal needles too high on Dr. York's spine, which allowed him to then pierce and directly insert anesthesia into Dr. York's spinal cord, killing nerves and causing his injuries. Plaintiffs claimed that Dr. El-Ganzouri erroneously injected anesthetic even as he was on notice of improper needle placement by Dr. York's screams. Plaintiffs contended that the error came about because Dr. El-Ganzouri felt pressure to perform the procedure quickly, and because he lost track of the proper disc space between which to insert the needles. Dr. El-Ganzouri had marked the insertion point by making an impression with his thumbnail, but he subsequently turned away to prepare more of the instruments needed for the procedure. The Yorks argued that Rush was accountable for Dr. El-Ganzouri's negligence because nobody informed Dr. York that he was an independent contractor, because he appeared to be a hospital employee based on the language in the consent form Dr. York signed and by his wearing scrubs with Rush's name and insignia on them, and because Dr. York relied on the hospital to provide the anesthesiologist for the procedure. Dr. El-Ganzouri countered that he met the

standard of care in performing the combined spinal epidural and that Dr. York's injuries actually resulted from a spinal infarction, meaning a deprivation of blood to the spine, that resulted from a drop in blood pressure during the surgery. He contended that Dr. York's expressions of pain resulted from needles striking nerves in the *cauda equina*, which would not have produced his severe injuries, nor been a deviation from the standard of care. Dr. El-Ganzouri denied that he ever injected anesthesia while Dr. York expressed pain, instead, withdrawing and reinserting the needle until there were no expressions of pain from Dr. York. Rush, in turn, denied that Dr. York relied on it to provide an anesthesiologist, claiming that Dr. York relied on his son Jeff, who was an anesthesiology resident at Rush and fully aware that University Anesthesiologists was a group of independent contractors, to choose a specific anesthesiologist for the procedure.[2] Rush further denied that Dr. York could reasonably have believed that Dr. El-Ganzouri was a Rush employee because he had previously received a bill from University Anesthesiologists for one of his prior surgeries, and because, based on his own experience as an independent contractor in the medical profession, working with independent anesthesiologists, Dr. York had to know that anesthesiologists were independent contractors.

## II. ANALYSIS OF DR. EL-GANZOURI'S CLAIMS

### A. Alleged Unreasonable Time Restriction on *Voir Dire*

On May 28, 2002, with trial to begin the following Monday, Judge Flannery reminded the parties of his policies for *voir dire*. He explained that each side was limited to 20 minutes of questioning per panel of 14 prospective jurors, meaning that Dr. El-Ganzouri and Rush would receive 10 minutes apiece per panel. He encouraged the attorneys to address the panel as a group. Judge Flannery advised that venirepersons providing answers that suggested an inability to be fair or to serve based on significant hardship would be called back to his chambers for follow-up questioning. Defendants had no objection at that time.

The following day, May 29, the parties again came before the trial court. At that time, counsel for Dr. El-Ganzouri stated:

"I did though want to ask the court *** if the court would reconsider maybe giving the defendants a little bit more time. I did the math. It works out to just under 43 seconds per venire person ***.

\* \* \*

[2]Throughout this opinion, "Dr. York" shall signify Dr. James York, the plaintiff. Dr. York's son, Dr. Jeff York, will be referred to as "Dr. Jeff York."

I have been told by the plaintiff's attorney that he perceives this is a case that could potentially be larger than the limits of the doctor, and I respectfully ask the court to reconsider giving us more than 43 seconds per person."

Rush's counsel also indicated that he "would take advantage of a little bit more time if the court was so inclined." The trial court denied the request, however, and the defendants did not pursue the matter further. Jury selection then began.

After asking collectively if the venirepersons knew him, any of the parties, any of the anticipated witnesses, or any of the attorneys, Judge Flannery questioned each of the members of the first panel of venirepersons individually. Judge Flannery asked each venireperson where he or she lived, what his or her occupation was, if he or she was married, and if he or she had children. He inquired about the occupation of the spouses of the married venirepersons. Judge Flannery then asked the panel collectively to volunteer if any of them had served on a jury before. When a venireperson indicated that he or she had, Judge Flannery inquired as to the nature of the case and if it would affect the venireperson's ability to be fair in this case. Judge Flannery also asked the members of the venire panel to volunteer if they, their family, or any close friends had been involved in litigation. Again, when a venireperson indicated that he or she had, Judge Flannery inquired as to the nature of the case and if it would affect the venireperson's ability to be fair in this case. Judge Flannery repeated this procedure for two additional panels of venirepersons. After the judge questioned a panel, he would then turn the panel over to the attorneys for examination.

The judge's questioning revealed a great deal of information about the venirepersons. For example, the judge's questions revealed that the panel included people whose work touched on issues involved in the case or who were close to people with such experience. The venire included two nurses, a nursing student, a husband to a nurse, a professor of economics, a billing clerk for a medical practice, and a hospital food service worker. The judge's questions also disclosed the significant prior litigation experience of the venirepersons. The venire contained one close friend and one relative to plaintiffs in medical malpractice cases; six plaintiffs, or relatives of plaintiffs, in auto crash cases, including one case in which the venireperson's daughter died; two former defendants, or relatives of defendants, in auto crash cases; the relative of a former plaintiff involved in commercial litigation and a resulting attorney malpractice case; a former plaintiff in a consumer fraud case; a plaintiff in eviction proceedings; and finally, one plaintiff and one relative of a defendant in slip-and-fall cases.

Plaintiff's counsel's questions revealed a good deal more. Dr. York's attorney inquired as to the panel's outlook on medical malpractice litigation. Examining one venireperson who worked for an insurance company, the following conversation occurred:

"MR. CLIFFORD [plaintiff's counsel]: At the end of the case, it would be and is my intention to ask on behalf of my client for the jury to return an award of many millions of dollars.

Would you be able to do that if the law and evidence supported our case, sign such a verdict?

JUROR: Not for a large amount of money like that, no.

MR. CLIFFORD: Okay. Thank you. And I appreciate your candor."

Two other jurors from the second panel made similar statements. In response to another representation by plaintiff's counsel that he would be asking for a multimillion dollar award, and his question if that large monetary figure meant that Dr. York would be "starting out behind the eight ball with you," one venireman replied "[i]t would be a problem to be fair to you," while the other stated "I have exactly the same view *** [s]ky high settlements, I am opposed to." In response to further questioning, the second juror indicated that unless Dr. York was extremely young, or a paraplegic, he would have difficulty being fair to him.

Dr. El-Ganzouri's and Rush's counsel were similarly effective in extracting important information from the venire. Their questioning revealed four venirepersons who, based on the severity of Dr. York's injuries, were not certain that they could bring themselves to return a verdict of not liable. Their exploration into the prior medical experiences and care of the panel, and of the panel's friends and relatives, revealed a venireperson who had undergone spinal anesthesia at Rush with a bad result, a venireperson whose aunt suffered paralysis after receiving spinal anesthesia, and a venireperson who felt that her niece's daughter's death had occurred as a result of hospital malpractice.

Dr. El-Ganzouri's counsel was advised during his examination of the first two panels of venirepersons when he had only had five minutes left. During his questioning of the final panel of venirepersons, the court advised counsel to conclude with "one more question." However, at no point, other than before beginning *voir dire*, did Dr. El-Ganzouri's counsel ever ask for additional time. Moreover, he never purported to proceed up to his time limit while conducting *voir dire*. In fact, in response to the court's instruction to only ask one more question, counsel stated: "I think the last one [the last question asked] is pretty good. I'm done. Thanks a lot."

The court excused a number of the venire for cause, including those under consideration that had expressed an unwillingness to grant a large award and those who expressed a reluctance to award judgment to the defendants because of Dr. York's significant injuries. Defendants exercised all of the seven peremptory challenges granted by the court, while plaintiff exercised six.

The final jury of 14, including 2 alternates, consisted of a software trainer who had been a plaintiff in an auto crash, and who received bad care at a hospital for cuts to her arm[3]; a hospital food service worker who was a plaintiff in an automobile negligence case in which her daughter had died; an operations manager for a chemical company; a cabinetmaker whose wife had to use a walker as a result of bone cancer; a billing clerk for a medical practice who had received training to be an occupational therapy volunteer at Rush; a train car repairman whose wife was a nurse; a clerk; an employee of a tax preparation firm; a Denny's restaurant manager; a machinist who had been a defendant in an auto crash case; a newspaper delivery employee who had undergone spinal anesthesia without complication; a clerk at the Chicago Ford Motor Company plant; a pharmacy accounts payable manager who had undergone a spinal epidural without incident at another of Rush's facilities; and an unemployed production supervisor whose parents had been sued when someone fell on their property. This jury was sworn and impaneled without objection by the defendants.

■ Dr. El-Ganzouri contends that Judge Flannery's time limitation on *voir dire*, which he characterizes as "extreme and unreasonable," denied him his "right to a fair and impartial trial by jury" and violated Supreme Court Rule 234 (177 Ill. 2d R. 234), which states:

"The court shall conduct the *voir dire* examination of prospective jurors by putting to them questions it thinks appropriate touching upon their qualifications to serve as jurors in the case on trial. The court may permit the parties to submit additional questions to it for further inquiry if it thinks they are appropriate, and shall permit the parties to supplement the examination by such direct inquiry as the court deems proper for a reasonable period of time depending upon the length of examination by the court, the complexity of the case, and the nature and extent of the damages."

Dr. El-Ganzouri contends that as a result of the trial court's time restriction he was unable to individually address questions to each of the jurors on all three panels. Further, he claims that the time limit

---

[3] This juror was later excused to allow her to attend a previously scheduled family function.

prevented him from inquiring about the second panel's experience with disabled people, and from exploring any prejudice or bias in the third panel surrounding damages. Dr. York initially counters that Dr. El-Ganzouri has waived any challenge to Judge Flannery's *voir dire* procedure as he did not specifically object to the procedure, nor make an offer of proof in the circuit court as to what questioning the time limit prevented. Alternatively, Dr. York argues that the parameters set by the trial judge were reasonable and allowed sufficient questioning of the venire to ferret out prejudice and bias. We agree with both of Dr. York's arguments.

■ To begin, Dr. El-Ganzouri has waived any challenge to Judge Flannery's *voir dire* time limitations by failing to make a timely objection to the procedure. To preserve a trial error for review on appeal, a party must make a timely objection. *People v. Stewart*, 343 Ill. App. 3d 963, 979, 799 N.E.2d 1011, 1024 (2003). "Where a party fails to make an appropriate objection in the court below, he or she has failed to preserve the question for review and the issue is waived." *In re April C.*, 326 Ill. App. 3d 225, 242, 760 N.E.2d 85, 98 (2001). A primary purpose of the waiver rule is to ensure that the trial court has the opportunity to correct the error. *Stewart*, 343 Ill. App. 3d at 979, 799 N.E.2d at 1024. A trial court cannot correct the error and prevent prejudice when the objection is not made as the error occurs. See *Prairie v. Snow Valley Health Resources, Inc.*, 324 Ill. App. 3d 568, 573, 755 N.E.2d 1021, 1027 (2001) (finding an objection to testimony untimely when the testimony was presented twice and only objected to the second time); *Sramek v. Logan*, 36 Ill. App. 3d 471, 473-74, 344 N.E.2d 47, 49 (1976) (finding a claim of error surrounding comments in closing argument waived when not objected to as the comments were made). In this case, Dr. El-Ganzouri's counsel requested additional time for *voir dire* before the proceedings began, anticipating that he would not be able to expose bias in the venire in the amount of time allotted. However, he did not make any further efforts to procure additional time when he actually conducted the *voir dire*. In that respect, the rule would be analogous to that which generally applies to motions *in limine*, where ordinarily the advance ruling will not suffice to preserve error in the absence of a contemporaneous objection to the actual use or exclusion of that evidence in its actual trial context. See *Simmons v. Garces*, 198 Ill. 2d 541, 569, 763 N.E.2d 720, 738 (2002) ("[t]he denial of a motion *in limine* does not in itself preserve an objection to disputed evidence that is introduced later at trial. *** '[A] contemporaneous objection to the evidence at the time it is offered is required ***.' [Citation.]"); accord *Bachman v. General Motors Corp.*, 332 Ill. App. 3d 760, 791-92, 776 N.E.2d 262, 290-91

(2002). Therefore, the time for Dr. El-Ganzouri to object was as the alleged damage was being done, namely, at the time that the trial court cut off his *voir dire* examination while he had pertinent questions yet to ask. Yet, he did not make any objection at any time during *voir dire*. Instead, on two occasions he ceased questioning the venire prior to any final warning from the trial court, and when informed he could only ask one more question of another panel, he declined to do so.

Even more overriding, Dr. El-Ganzouri waived any claim of error in the *voir dire* procedure by accepting the jury without objection. As the Florida Supreme Court observed, when reviewing a claim of error in *voir dire* proceedings:

> "[The defendant] affirmatively accepted the jury immediately prior to its being sworn without reservation of his earlier-made objection. We agree with the district court that counsel's action in accepting the jury led to a reasonable assumption that he had abandoned, for whatever reason, his earlier objection. It is reasonable to conclude that events occurring subsequent to his objection caused him to be satisfied with the jury about to be sworn. We therefore approve the district court to the extent that the court held that \*\*\* [the defendant] waived his \*\*\* objection when he accepted the jury." *Joiner v. State*, 618 So. 2d 174, 176 (Fla. 1993).

Accord *Green v. State*, 679 So. 2d 1294 (Fla. App. 1996) (finding challenge to time limits on *voir dire* waived by acceptance of jury without objection). These holdings are also consistent with Illinois law, which recognizes that courts may infer a party's subsequent acquiescence in court procedures after making contrary motions. See *People v. Ephraim*, 411 Ill. 118, 123, 103 N.E.2d 363, 366 (1952) ("[t]he record here shows that the defendant made a *pro forma* request that he be allowed to defend himself, then failed to actively or sincerely pursue it until his appearance in this court. \*\*\* [T]he record shows that he waived that right by his acquiescence in, and failure to object to, the appointment of [an] attorney"); see also *Comerford v. Jones*, 73 Ill. App. 2d 90, 218 N.E.2d 502 (1966) (abstract of op.) ("[W]here a litigant is represented by competent and experienced counsel, and objections are not made, we must conclude that the choice was a conscious one weighing the possible prejudice of objecting in the presence of the jury against the prejudice of the objectionable matter itself"). By accepting the impaneling of the jury without objection, Dr. El-Ganzouri allowed a reasonable conclusion that he had no ongoing objection to the *voir dire* procedure as it had been applied, and deprived the trial court of a reasonable opportunity to correct any error by allowing further questioning or by striking the venire and starting jury selection over again. Thus, on this basis too, Dr. El-Ganzouri has waived any arguments surrounding *voir dire*.

Finally, Dr. El-Ganzouri has waived his *voir dire* argument on appeal because he failed to make a record in the trial court of what questions he yet wanted to ask of what venirepersons so as to demonstrate prejudice. As the Texas Court of Appeals observed, "[w]hen objecting to a voir dire limitation, it is the attorney's burden to preserve error by informing the trial court of the questions he or she was not permitted to ask, at a time when the court can act to rectify any error." *Dhillon v. State*, 138 S.W.3d 583, 591 (Tex. Ct. App. 2004); see also *People v. Daniels*, 172 Ill. 2d 154, 166, 665 N.E.2d 1221, 1227 (1996) ("defendant adequately preserves the error [of the provision of insufficient peremptory challenges] by making an appropriate and timely request for the full number of peremptories, if defendant uses all of the peremptory challenges allowed by the court, *and if defendant brings to the trial court's attention during voir dire* facts relevant to defendant's claim *that he or she would have exercised additional peremptory challenges against one or more jurors had additional challenges been allowed*" (emphasis added)). Without this record, a court of review cannot determine whether the trial court improperly limited *voir dire*, as the limitation of questioning would have been appropriate were the precluded questions irrelevant, immaterial, repetitious, or otherwise improper. *Dhillon*, 138 S.W.3d at 589-90. Dr. El-Ganzouri identifies now what questions he wanted to ask of at least some of the jurors on the third panel, but now it is too late; he needed to make this record in the trial court.

Waived errors may still be subject to plain error review. *Prairie*, 324 Ill. App. 3d at 574, 755 N.E.2d at 1027. However, "[p]lain error is a limited and narrow exception to the general waiver rule." *In re Detention of Traynoff*, 338 Ill. App. 3d 949, 963, 789 N.E.2d 865, 877 (2003). Relief under the plain error doctrine should be "exceedingly rare" in civil cases, limited to circumstances where the proceedings deprived the appellant of a fair trial and amounted to "an affront to the judicial process." *Dowell v. Bitner*, 273 Ill. App. 3d 681, 693, 652 N.E.2d 1372, 1380 (1995). We detect no such circumstances here.

"The purpose of *voir dire* is to insure the selection of an impartial panel of jurors free from bias or prejudice." *Stewart*, 343 Ill. App. 3d at 977, 799 N.E.2d at 1022. As Professor Mauet points out in his practical treatise:

> "[S]everal basic background characteristics *** are seen as the best *** predictors of likely attitudes [among venirepersons]:
> 1. age
> 2. education
> 3. employment history
> 4. residence history

5. marital and family history
6. hobbies and interests
7. reading, television, and computers
8. participation in organizations
9. experiences in life related to case on trial." T. Mauet, Trial Techniques 43-44 (6th ed. 2002).

The court through its own questioning touched on the venirepersons' employment histories and marital and family situations. The approximate ages of the venirepersons would have been apparent to the parties by their appearance. The court also drew cut many of the venirepersons' experiences in life related to the present case by eliciting their litigation experience, plus the experiences of their friends and families, and their prior jury service. As noted previously, counsel for all parties were then able to elicit more information about the venire's relevant experiences by asking group and individual questions regarding their and their loved ones' medical histories. Defense counsel were likewise able through their questioning to identify venirepersons involved in organizations identical or similar to those Dr. York participated in, discov ring three fellow Navy veterans and two active church members. "It must be remembered that all a party to a suit is entitled to in any lawsuit is a jury composed of persons who have sworn under oath that they can \*\*\* judge the case solely on the facts produced in open court and on the law given them by the trial judge." *Hockett v. Dawdy*, 180 Ill. App. 3d 491, 498, 536 N.E.2d 84, 89 (1989). In light of the wealth of information about the veni·e revealed between the trial court's questions and those propounded by counsel in the time allotted, we believe Dr. El-Ganzouri was able to ensure that he received a jury capable of honest service and find no affront to the judicial process through the imposition of the time limitation. Moreover, while we explicitly disclaim any attempt to establish a bright-line rule for acceptable time limits, and further note that our affirmance of the imposition of relatively rigid time limits in no way reflects our personal inclinations, we recognize that other courts have upheld 20-minute time limits per side, or even less, at least when the trial court also propounds questions. See *Dhillon*, 138 S.W.3d 583 (15 minutes); *State v. Martinez*, 131 N.M. 746, 42 P.3d 851 (App. 2002) (20 minutes); *Roberts v. State*, 268 Ind. 127, 373 N.E.2d 1103 (1978) (20 minutes).

Finally, we note that while Dr. El-Ganzouri now claims that he was deprived of sufficient time for *voir dire*, the record reflects that he was less than efficient in utilizing the time allowed. Three venirepersons pointedly stated in their answers to plaintiff's counsel's questions that they could not be fair because they opposed multimillion dollar

awards, such as plaintiff indicated that he would ask for in this case, irrespective of what evidence Dr. York would present. With those statements, which should be appreciated for their candor, Dr. El-Ganzouri should have realized that those venirepersons could not serve on the jury. However, Dr. El-Ganzouri then wasted time attempting to rehabilitate these venirepersons, apparently in the hope of preventing their dismissal for cause, thereby forcing plaintiff to exercise peremptory challenges against them. Dr. El-Ganzouri asked these venirepersons broadly if they understood that it was the jury's responsibility to determine the verdict and if they could award a "fair" verdict. Not surprisingly, in light of their earlier statements, when called to Judge Flannery's chambers for further examination, the two veniremen from the second panel even more strongly emphasized their unequivocal opposition to large medical malpractice verdicts. One said that he "would be fighting against" his fellow jurors to prevent them from making such an award if he were impaneled, the other that he would "fight tooth and nail" to keep any verdict under $1 million, regardless of what the trial evidence might be. Judge Flannery appropriately excused all three venirepersons for cause. Parties may not complain of an inadequate opportunity to question the venire when they waste the time they are given. See *Dhillon*, 138 S.W.2d at 587-88 ("[w]hen a party complains of an inability to *** question the venire, a two part test applies: (1) whether the complaining party attempted to prolong the voir dire ***. A party attempts to prolong the *voir dire* when he asks irrelevant, immaterial, or repetitious questions"); see also *Martinez*, 131 N.M. at 755, 42 P.3d at 860 (noting that with better organization of her *voir dire*, counsel could have asked the questions claimed to be precluded within the trial court's time limits).

Along these same lines, we also note that the record does not show that Dr. El-Ganzouri ever proposed questions to be asked of the venire by the judge, as permitted under Rule 234, which would not have counted against his time. At oral argument, Dr. El-Ganzouri stressed that he was not invited by the trial court to propose supplemental questions for its *voir dire* examination. However, we see no reason logically, or under the rule, for him to not seize the initiative and, instead, wait to be invited.

Dr. El-Ganzouri makes one other related argument surrounding *voir dire*. He claims that by indicating that it would count any use of Dr. York's "day-in-the-life" video against his 10 minutes for *voir dire*, the circuit court effectively, improperly precluded him from using the video in *voir dire*.

The following exchange also occurred during the May 28 discussion between the parties and the court surrounding *voir dire*:

"THE COURT: Let's talk about it real quickly. What I am saying is, there was an issue, and do you want to use it? Is anybody asking to use the day in life in jury selection?

MR. PETREK: I am, without sound.

\* \* \*

MR. CLIFFORD: And we are opposed of showing it during the *voir dire* examination. I think that to do so highlights one piece of evidence, unfairly prejudices the plaintiff and ought not to be permitted.

THE COURT: Is it going to be used during the trial?

MR. CLIFFORD: Yes, Your Honor.

THE COURT: Okay. The objection is overruled. You could use it if you want. You have ten minutes. I don't know long the film is. If you want to take five minutes of the film to use it, go ahead, then you have five minutes left to do your questioning. You could use it if you want. Whatever you need, have it here.

MR. CLIFFORD: So it goes against his time?

THE COURT: Yes.

\* \* \*

THE COURT: All right. Anything else?"

After this exchange, Dr. El-Ganzouri's counsel made no further statements to the circuit court. During *voir dire*, he made no objection to his perceived inability to use the video and otherwise conduct a thorough examination of the venire. Dr. York contends that, based on his lack of objection, Dr. El-Ganzouri has waived this *voir dire* claim on appeal as well as his claim surrounding the circuit court's time limit. In keeping with our previous analysis, we agree and therefore decline to review this issue.

## B. Alleged Improper Impeachment of Dr. Meyer With Rule 213(g) Answers Prepared and Sworn to by Defense Counsel

■ At trial, Dr. Meyer testified on direct examination, on behalf of Dr. El-Ganzouri, that Dr. York's injuries resulted from a spinal infarct, meaning a deprivation of blood and oxygen to the spine, causing the death of the deprived tissues. Dr. Meyer opined that the infarction resulted from systemic hypotension (low blood pressure) during the knee replacement surgery. He denied that an injury was caused by the entry of a needle and injection of anesthesia into Dr. York's spinal cord, explaining that he would have expected to find a "blob" or "puddle" of anesthesia around the point of insertion in MRIs of Dr. York's spine, but he did not find such a mass. The effect of this testimony was to attribute Dr. York's injuries to the knee surgery and not to the anesthesia procedures.

The following exchange occurred when Dr. Meyer was subject to cross-examination:

"MR. CLIFFORD: Okay. And then after you got those additional records, you conferred with Counsel; did you not?

DR. MEYER: Yes.

MR. CLIFFORD: And you told Counsel your opinions; did you not?

DR. MEYER: Yes.

MR. CLIFFORD: And those opinions, I believe, were filed with the Court on August 14, 2001; and one of them was, 'It is more likely than not that James York sustained a spinal cord infarct. This infarct more likely than not was caused by either the spinal needle, catheter, agent or a combination thereof coming in contact with a vessel, which in turn caused ischemia to the patent's spinal cord.' That was one of your original opinions; true?

DR. MEYER: Yes.

MR. CLIFFORD: And that is not your opinion today; true?

DR. MEYER: That's correct, and that was clarified at the deposition.

\* \* \*

MR. CLIFFORD: Doctor, just so we deal with this in a perspective of time, these opinions of yours initially to the effect that the spinal—you've always had the view that he had a spinal cord infarct, right?

DR. MEYER: Yes.

MR. CLIFFORD: But you originally held the view that the spinal cord infarct was caused by either the needle, the catheter, the agent, which I take to be the Marcaine, or a combination thereof coming into contact with a vessel, which in turn caused ischemia; isn't that right?

DR. MEYER: Yes.

MR. CLIFFORD: And you gave—those opinions were disclosed on August 21 of 2001 signed by that lady Irwin, right?

DR. MEYER: By Shirley Irwin, that's correct.

MR. CLIFFORD: And but Shirley Irwin is not a doctor, right? You know that to be a fact; don't you?

DR. MEYER: Yes.

MR. CLIFFORD: And the fact is that what she wrote down and what she filed in court she got from you and confirmed by you, correct?

DR. MEYER: She did get that from me. I don't know that it was completely confirmed prior to those being filed.

MR. CLIFFORD: Okay. Fair enough. And this clarification, your word, not mine, that you're talking about here, you gave your deposition in this case on September 4, 2001, some 10, 15 days later, so say two weeks later. So you're telling us that between August 21 and September 4th, two weeks, you did further study

that gave you this enlightenment about hypotensive events that contributed to the spinal cord infarct, right?

MR. PETREK: Objection, your Honor. That assumes facts not in evidence.

THE COURT: Overruled.

\* \* \*

MR. CLIFFORD: Okay. So when you tell us that you've clarified, the fact is you've not withdrawn the idea—or maybe you are. Let's get this straight. Are you withdrawing the idea that the spinal cord infarct was caused either by the spinal needle, the cath, the agent or a combination thereof coming into contact with a vessel; are you withdrawing that?

MR. PETREK: Object to the form of the question.

\* \* \*

MR. CLIFFORD: Are you withdrawing that opinion?

DR. MEYER: I just don't know what it means to withdraw it in a legal sense, so you might—

MR. CLIFFORD: Drop it, give it up, throw it out.

DR. MEYER: That's not what I think happened.

MR. CLIFFORD: I'm talking about the opinion now.

DR. MEYER: Yes.

MR. CLIFFORD: Are you still holding to that opinion, yes or no?

DR. MEYER: No, I don't think that that's the opinion.

MR. CLIFFORD: Okay. But you do think that the opinion that you came up with at your deposition two weeks later is the answer to what occurred here?

MR. PETREK: Object to the form of the question."

Dr. El-Ganzouri contends that such impeachment was improper because an attorney, as opposed to Dr. Meyer himself, prepared and swore to the interrogatory answer, which should therefore not be attributable to Dr. Meyer, and that Dr. Meyer was therefore not subject to any impeachment as his deposition and trial testimony were identical. Dr. York counters first that Dr. El-Ganzouri waived this challenge by his failure to make an appropriate, timely objection, and secondly because the explicit language of Rule 213 allows for such interrogatory answers to be used for impeachment. We agree with both of plaintiff's arguments.

Defendant contends that he has preserved this alleged error for review by objecting. However, as discussed in our analysis of Dr. El-Ganzouri's waiver of his *voir dire* challenge, merely objecting is not enough to preserve errors for review. To be effective in preserving an error, an objection must be timely, meaning contemporaneous with the objectionable conduct. See *Prairie*, 324 Ill. App. 3d at 573, 755 N.E.2d at 1027. Here, however, just like in *Prairie*, multiple references to the

interrogatory answer, to which the appellant would object on appeal, went by unchallenged in the trial court before an objection was made. Moreover, an objecting party must identify the same basis for his objection in the trial court that he will argue on appeal. *Gausselin v. Commonwealth Edison Co.*, 260 Ill. App. 3d 1068, 1079, 631 N.E.2d 1246, 1254 (1994) ("when an objection is made, specific grounds must be stated and other grounds not stated are waived on review"). Thus, in *Gausselin*, the court found that the plaintiff/appellant had waived his challenge to the appellee's calling of a certain witness as an expert when "plaintiff never raised Rule 220 [Rule 213's predecessor] as an objection, nor did he ever complain that [the witness] was offering expert testimony," and the record revealed "that plaintiff's objections were limited to such grounds as lack of foundation ***, speculation, leading, and relevance." *Gausselin*, 260 Ill. App. 3d at 1079, 631 N.E.2d at 1254. Similarly, Dr. El-Ganzouri never objected to Dr. York's counsel's use of the interrogatory answer for Dr. Meyer but rather objected, primarily, to what he perceived to be vagueness or incomprehensibility in opposing counsel's impeachment questions. Thus, if subject to any review, Dr. El-Ganzouri's impeachment claims would be reviewed for plain error. See *Prairie*, 324 Ill. App. 3d at 574, 755 N.E.2d at 1027. Moreover, even without relying on waiver, we detect no error here, let alone an error that would constitute an affront to the judicial process.

To begin, as Dr. York suggests, the plain language of the rule supports the availability of Rule 213(g) interrogatory answers for impeachment of an expert witness. Section (h) of the rule states: "Answers to interrogatories may be used in evidence to the same extent as a discovery deposition." 177 Ill. 2d R. 213(h). Supreme Court Rule 212(a)(1), addressing the use of discovery depositions, explains that "[d]iscovery depositions *** may be used *** for the purpose of impeaching the testimony of the deponent as a witness in the same manner and to the same extent as any inconsistent statement made by a witness." 188 Ill. 2d R. 212(a)(1); see also *Estate of Whittington v. Emdeko National Housewares, Inc.*, 96 Ill. App. 3d 1007, 1011, 422 N.E.2d 26, 30 (1981) (observing the same interrelation between the two rules).

That the interrogatory answers may have been completed and signed by an attorney, as opposed to the expert, in our view, cannot justify modification of the plain meaning of the rule allowing impeachment. Courts have long understood that the answers to Rule 213 interrogatories surrounding experts are a collaboration between the expert and the retaining party. As the Rules Committee explained in its comments to the most recent revision of the rule: "The party can count on

full cooperation from [controlled expert] witnesses \*\*\*, so the amended rule requires the party to provide all of the details required by the former rule." 210 Ill. 2d R. 213(f), Committee Comments; see also *Regala v. Rush North Shore Medical Center*, 323 Ill. App. 3d 579, 585, 752 N.E.2d 443, 448 (2001) ("[e]xperts must be made aware *by their attorney* of the importance that their opinions at trial are consistent with their pretrial disclosures") (emphasis added); *Copeland v. Stebco Products Corp.*, 316 Ill. App. 3d 932, 938, 738 N.E.2d 199, 205 (2000) ("[l]*itigants* have an obligation \*\*\* to disclose *the testimony* of their experts") (emphasis added)). Yet, in spite of this knowledge, our supreme court still authorized the use of interrogatory answers for impeachment, without qualification for Rule 213(g) interrogatory answers, in section (h) of the rule.

Further, we note that the appellate court has already held that "[t]he fact that a document is not signed by the witness does not render it incompetent for impeachment." *Estate of Whittington*, 96 Ill. App. 3d at 1012, 422 N.E.2d at 31. The determinative factor as to when a document prepared by and signed by another may be used against a witness is whether the witness was aware of and approved of the contents of the document. Contrast *Estate of Whittington*, 96 Ill. App. 3d at 1012, 422 N.E.2d at 31 ("there was sufficient evidence that Mrs. Walker swore to the contents of the interrogatory and authorized her attorney to sign. Hence the trial court did not err in allowing the document to be used for impeachment purposes"), and *Nystrom v. Bub*, 36 Ill. App. 2d 333, 348-49, 184 N.E.2d 273, 280 (1962) (allowing a party to be impeached with the interrogatory answer prepared by its attorney when "[t]he defendants' attorney had authority to make the admission; the weight to be given the testimony and the admission were for the jury"), with *Castle v. Searles*, 306 Ill. App. 304, 308, 28 N.E.2d 619, 621 (1940) (holding a written statement signed by a witness's daughter not valid to impeach the witness when he did not recall providing information for the statement or authorizing his daughter to sign for him). In light of the collaborative nature of the preparation of Rule 213 interrogatories, and attorneys' duty to stress the importance to their experts of the accuracy and completeness of their pretrial disclosures (*Regala*, 323 Ill. App. 3d at 585, 752 N.E.2d at 448), which we will assume attorneys fulfill, we are inclined to think that retained experts implicitly authorize attorneys to reduce their opinions to writing and attest to the accuracy of the interrogatory answer. However, we need not so hold in this case because Dr. Meyer specifically testified that he gave the opinion recorded in the Rule 213(g) answer to the attorney and that it was recorded accurately,

thereby laying a proper foundation for the introduction of that opinion as conceded by Dr. El-Ganzouri at oral argument. Therefore, no error occurred when Dr. York's counsel impeached Dr. Meyer with the Rule 213(g) answer based on the answer being typed and sworn to by counsel.

Dr. El-Ganzouri, however, also claims that, as Dr. Meyer explained the change in his position from his Rule 213(g) disclosure at his deposition, and because his deposition testimony was consistent with his trial testimony, impeachment with the interrogatory answer was nevertheless improper; he cites to the Fifth District case of *Buehler v. Whalen*, 41 Ill. App. 3d 446, 355 N.E.2d 99 (1976), in support of his position. We disagree. First, we find *Buehler* inapposite to the present case. The *Buehler* court did not address the changing opinion of an expert between his interrogatory answers and his deposition and trial testimony and the effect that would have on the credibility of the most recent opinion. Rather, *Buehler* dealt with a party's attempt to use a defendant's interrogatory answer denying the existence of an adverse study, when it later admitted the study's existence and produced the study before trial, to shame the defendant in the eyes of the jury for its initial discovery violation. *Buehler*, 41 Ill. App. 3d at 457, 355 N.E.2d at 108-09 ("Nor was the statement used to impeach any witness as it may have properly been used. The plaintiffs' purpose in reading the interrogatory as substantive evidence, was clearly designed to show that Ford was not truthful in its answer"). Second, "the fact that defendant has an explanation for the [prior] statement does not work to remove the facial inconsistency." *People v. Davis*, 106 Ill. App. 3d 260, 264, 435 N.E.2d 838, 842 (1982). Substantial, material prior inconsistent statements should be presented to the jury because they impact the credibility of the witness, and credibility determinations are the province of the jury. See *Oldham v. Kubinski*, 37 Ill. App. 2d 65, 78, 185 N.E.2d 270, 275 (1962). Just as a witness's prior inconsistent statement does not render his subsequent testimony inadmissible (*Oldham*, 37 Ill. App. 2d at 78, 185 N.E.2d at 275), his explanation for that inconsistency does not bar introduction of the earlier statement (see *LaSalle National Bank v. 53rd-Ellis Currency Exchange, Inc.*, 249 Ill. App. 3d 415, 434, 618 N.E.2d 1103, 1117 (1993) ("[s]tatements and assertions which may have been superseded for one legal purpose may still be used to impeach a witness' credibility"); see also *Palumbo v. Kuiken*, 201 Ill. App. 3d 785, 790, 559 N.E.2d 206, 209 (1990) (permitting superceded or withdrawn interrogatory answers to be used for impeachment)).

All the existence of an explanation for a prior inconsistent statement demands under the law is an opportunity to present that explanation. As Professor Wigmore explained:

"The contradictory statement indicates on its face that the witness has been of two minds on the subject, and therefore that there has been some defect of intelligence, honesty, or impartiality on his part; and it is conceivable that the inconsistency of the statements themselves may turn out to be superficial only, or that the error may have been based not on dishonesty or poor memory but upon a temporary misunderstanding. To this end it is both logical and just that the explanatory circumstances, if any, should be received ***." 2 J. Wigmore, Evidence § 1043, at 500-01 (2d ed. 1923).

See also *People v. Hicks*, 28 Ill. 2d 457, 462, 192 N.E.2d 891, 894 (1963) ("[t]he rule in such cases is that when proof is introduced that a witness has made prior inconsistent statements, the witness should be afforded an opportunity of explaining these statements and showing the circumstances under which they were made"). In this case, there was an opportunity for Dr. Meyer to explain the change in his opinion during his redirect examination, though, for whatever reason, defense counsel chose to rehabilitate the witness on other issues raised during the cross-examination. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 613.3, at 573 (7th ed. 1999) ("[t]he cross-examiner does not herself have to provide the witness the opportunity to correct or explain; the opportunity for the witness to correct or explain the apparent inconsistency on redirect examination suffices"). Therefore, there was no error in allowing Dr. Meyer's impeachment with his Rule 213(g) interrogatory answer.

## C. Setoff

Finally, Dr. El-Ganzouri claims that the circuit court erroneously denied his motion for a reduction in the damages awarded by the amount of any past medical expenses paid by Dr. York's health insurance. We again disagree.

As a preliminary matter, we observe that Dr. El-Ganzouri makes this claim pursuant to both sections 2—1205 and 2—1205.1 of the Code of Civil Procedure. 735 ILCS 5/2—1205, 2—1205.1 (West 2002). The two sections are quite similar, except that section 2—1205 specifically addresses the setoffs applicable in medical malpractice cases, and section 2—1205.1 limits its application to cases to which section 2—1205 does not apply. Incidentally, Dr. York had pointed out this distinction to Dr. El-Ganzouri in his response to Dr. El-Ganzouri's motion for setoff. Therefore, we will evaluate Dr. El-Ganzouri's claim exclusively under section 2—1205, though we will also draw guidance from precedents interpreting the nearly identical provisions in section 2—1205.1.

■ Section 2—1205 provides:

"An amount equal to the sum of *** 100% of the benefits provided for medical charges, hospital charges, or nursing or

caretaking charges, which have been paid, or which have become payable to the injured person by any other person, corporation, insurance company or fund in relation to a particular injury, shall be deducted from any judgment in an action to recover for that injury based on an allegation of negligence or other wrongful act *** on the part of a licensed hospital or physician; provided, however, that:
        ***
    (b) such reduction shall not apply to the extent that there is a right of recoupment through subrogation, trust agreement, lien, or otherwise[.]" 735 ILCS 5/2—1205 (West 2002).

■ Dr. El-Ganzouri contends that because Dr. York did not show proof of any liens from his insurers against the judgment, the insurers have no right of recoupment and therefore the entire $130,877.31 awarded as past medical expenses should be deducted from the judgment. However, as the court in *First Springfield Bank & Trust v. Galman* stressed, in evaluating a claimed setoff under section 2—1205.1, which also prohibits setoff when the collateral source has a right of recoupment, it is only the *right* of recoupment, *not the perfection of that right* that bars setoff. *First Springfield Bank & Trust v. Galman*, 299 Ill. App. 3d 751, 764, 702 N.E.2d 1002, 1010-11 (1998), *rev'd on other grounds*, 188 Ill. 2d 252, 720 N.E.2d 1068 (1999). Thus, the *Galman* court refused to deduct the plaintiff's French social security benefits from the judgment, when, under French social security law, l'Assurance Maladie, the overseeing agency, generally reserved the right to recoup benefits it paid from a third-party judgment, even though the French statutory procedure requiring the plaintiff to join l'Assurance Maladie to the third-party action to facilitate collection had not been followed. *Galman*, 299 Ill. App. 3d at 763-64, 702 N.E.2d at 1010-11. Therefore, whether or not Dr. York's insurers have perfected liens against the judgment is irrelevant. Rather, the pertinent question is whether Dr. York's insurers have subrogation rights under their policies so as to allow them to create a lien against the judgment.

Moreover, under both section 2—1205 and section 2—1205.1, to receive a setoff, the burden is on a defendant to prove that a plaintiff's insurer does not have a right of recoupment against the benefits it has paid. *DeCastris v. Gutta*, 237 Ill. App. 3d 168, 175, 604 N.E.2d 359, 364 (1992) (applying section 2—1205); *Galman*, 299 Ill. App. 3d at 763, 702 N.E.2d at 1010 (applying section 2—1205.1 and citing *DeCastris*). In the record in this case there is no evidence even of what medical expenses were paid by insurance, let alone any information about what recoupment rights Dr. York's insurers retained, save for Dr.

York's counsel's representations that there were, in fact, insurance liens against the judgment. Thus, Dr. El-Ganzouri failed to meet his burden, and the circuit court was correct in denying his motion for setoff.

## III. ANALYSIS OF RUSH'S CLAIMS

Rush argues on appeal that the trial court erred by refusing to grant it a directed verdict and judgment notwithstanding the verdict, refusing its jury instruction on apparent agency, and refusing to grant it a new trial. Rush contends that the manifest weight of the trial evidence only allowed the conclusion that Dr. York could not have reasonably believed that Dr. El-Ganzouri was a hospital employee and that he did not rely on Rush to provide the attending anesthesiologist for the knee surgery. Rush further contends that any reliance shown by Dr. York was not of the kind required for vicarious liability to attach. The trial testimony surrounding the choice of hospital and anesthesiologists for Dr. York's procedure and the appearance of the relationship between Dr. El-Ganzouri and Rush conflicted.

Dr. York testified that he was encouraged to come to Rush by his son, Dr. Jeff York, who was a resident anesthesiologist there, and a tennis partner who attended Rush's medical school. According to Dr. York, their encouragement was based on the overall quality of the hospital and its staff. Based on that encouragement, Dr. York testified that he sought to find a suitable orthopedic surgeon at Rush. Dr. York conceded that he always chose his orthopedist when he required treatment. Dr. York ultimately chose Dr. Rosenberg as his orthopedist at Rush and was particularly pleased with his care, to the point that he would have sought treatment from him even if he moved his practice to another hospital. However, he claimed that he always relied on the hospital at which he received treatment to provide anesthesia services.

Dr. York testified that he informed his son, prior to his total knee arthroplasty, that he was pleased with the anesthesiology services provided in one of his earlier surgeries by Dr. Miller and Dr. Krolic and asked if they could work with him again. While Dr. Miller was assigned to Dr. York's case, an assignment outside his normal area of practice, Dr. Krolic was not, as he was out of town. Dr. York testified that he did not know who was going to be his attending anesthesiologist until Dr. El-Ganzouri actually appeared and that he assumed that Rush would make a suitable assignment. He felt comfortable allowing the hospital to take care of the anesthesia arrangements because he knew it had good doctors on staff.

Dr. Jeff York testified that he knew that Dr. Miller would be the resident anesthesiologist for his father's surgery, but was unaware

who would serve as the attending anesthesiologist after Dr. Krolic proved to be unavailable. Rush's counsel impeached him with an answer in his discovery deposition, which implied that he did learn in advance that Dr. El-Ganzouri would serve as the attending anesthesiologist when he stated that he did not object when he found out that Dr. El-Ganzouri would serve in that capacity. On redirect examination, however, Dr. Jeff York stated that his father never told him who was going to serve as his attending anesthesiologist. Dr. Jeff York testified that, while he was fully aware that the anesthesiologists at Rush were not hospital employees but rather employees of University Anesthesiologists, he never discussed that fact with his father. He also explained that both attending and resident physicians working at Rush always wore either scrubs or lab coats with Rush's name and logo on them.

Ray Narbone, director of operating services at Rush, was responsible for making preliminary assignments of anesthesia personnel to surgical cases. His initial assignments would then have to be approved by the clinical coordinator for University Anesthesiologists. Narbone's office was inside of University Anesthesiologists' office suite, which was housed inside of a Rush building. His salary was paid half-and-half by Rush and University Anesthesiologists. Narbone testified that he believed that Dr. Jeff York had requested that Dr. El-Ganzouri serve as his father's attending anesthesiologist. However, Narbone had no specific recollection of such a request from Dr. Jeff York. Likewise, he generally did not keep records of staff requests for particular anesthesiologists and had no such record for Dr. Jeff York. Rather, he assumed that Dr. Jeff York had made such a request, because hospital staff typically requested specific personnel when their family members sought treatment at Rush, and because, otherwise, Dr. El-Ganzouri would not have been referred to work on an orthopedic case, which was outside of his specialty in general surgery.

A psychologist who had treated Dr. York at the Rehabilitation Institute of Chicago had included in one of her evaluations that he was "angry at his son for not choosing a better anesthesiologist." However, the doctor clarified that she meant not that Dr. York had relied on his son to choose an anesthesiologist, but rather that he was upset because Dr. Jeff York had not contacted him to inform him who the anesthesiologist would be.

An anesthesiologist who had practiced at the same hospital as Dr. York for many years in New Jersey testified that he was an independent contractor with the hospital. He believed that Dr. York would have to have known that the anesthesiologists were independent of the hospital but could not recall, however, if he had ever discussed his employment status with Dr. York. He also admitted that anesthesiolo-

gists at some hospitals, including larger, teaching hospitals, were employed directly by the institution. Dr. York, during his testimony, explained that he was too busy practicing medicine to learn about medical business arrangements.

Finally, Dr. El-Ganzouri testified that University Anesthesiologists sent bills with the practice's name on them to their patients, suggesting, as Dr. York had previous surgeries at Rush, that he would have been made aware by a prior bill that anesthesiologists at Rush were not hospital employees. Dr. York, however, testified that his wife handled all of their bills. The jury also received testimony surrounding Rush's surgical consent form, which Dr. York signed, authorizing "Dr. Rosenberg and such assistants and associates as may be selected by him/her and the Rush-Presbyterian-St. Luke's Medical Center to perform the following procedure(s)/treatment(s) upon myself/the patient."

Both motions for directed verdict and for judgment notwithstanding the verdict should only be granted when "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [a] movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967). On the other hand, a new trial should be granted only when "the verdict is contrary to the manifest weight of the evidence." *Mizowek v. De Franco*, 64 Ill. 2d 303, 310, 356 N.E.2d 32, 36 (1976). A verdict is contrary to the manifest weight of the evidence when the opposite conclusion is clearly evident, or when the jury's findings prove to be " ' "unreasonable, arbitrary and not based upon any of the evidence." ' [Citations]." *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132, 720 N.E.2d 242, 257 (1999). In conducting these analyses, we will keep in mind that credibility determinations and the resolution of inconsistencies and conflicts in testimony are for the jury. *People v. Rodriguez*, 291 Ill. App. 3d 55, 66, 684 N.E.2d 128, 135 (1997).

Rush contends that the evidence clearly established that Dr. York did not rely on any representation of the hospital in choosing to seek treatment at Rush. Rather, Rush argues, it was the incidental fact that Dr. Rosenberg, Dr. York's chosen surgeon, had privileges there that brought Dr. York and the hospital together. Rush contends that under these facts, as a matter of law, Dr. York did not show sufficient reliance on Rush for vicarious liability to attach and therefore that no verdict against Rush could ever stand.

In support of its conclusion, Rush relies on the cases of *Butkiewicz v. Loyola University Medical Center*, 311 Ill. App. 3d 508, 724 N.E.2d 1037 (2000), and *James v. Ingalls Memorial Hospital*, 299 Ill. App. 3d

627, 701 N.E.2d 207 (1998). Both of these cases held that when a patient could not show that he relied on a representation of a hospital in the initial decision to report to that hospital, any subsequent reliance on the hospital in selecting a particular doctor was not sufficient to establish vicarious liability against the hospital when the doctor was negligent. *Butkiewicz*, 311 Ill. App. 3d at 513, 724 N.E.2d at 1040 ("Plaintiff has failed to show that Mr. Butkiewicz actually relied on any representations of the hospital or Dr. Ramanauskas [the allegedly negligent doctor] in going to Christ Hospital"); *James*, 299 Ill. App. 3d at 635, 701 N.E.2d at 212 ("[plaintiff] did not in fact rely on any representations of the hospital or the doctor in going to Ingalls"). For example, in *James*, although primarily rejecting its plaintiff's claim of apparent authority based on the explicit representations in the hospital's consent form that all doctors who treated her would be independent contractors (*James*, 299 Ill. App. 3d at 632-33, 701 N.E.2d at 210-11), the court also found insufficient reliance by the plaintiff based on the fact that her primary reasons for reporting to Ingalls hospital were that she thought public aid required her to be treated there and because it was close to her house. *James*, 299 Ill. App. 3d at 635, 701 N.E.2d at 212. Similarly, the *Butkiewicz* court rejected its plaintiff's apparent authority claim, based on the alleged misreading of an MRI by an independent radiologist who was assigned to him by a hospital, when it observed that the plaintiff's reason for reporting to that hospital in the first place was the recommendation of his personal physician. *Butkiewicz*, 311 Ill. App. 3d at 513, 724 N.E.2d at 1040-41 ("Plaintiff has failed to show that Mr. Butkiewicz actually relied on any representations of the hospital or Dr. Ramanauskas in going to Christ Hospital. It is uncontradicted that Mr. Butkiewicz went to Christ Hospital because Dr. Basu told him to go there").

Dr. York, on the other hand, contends that the critical question is not why a plaintiff chose a particular hospital but, rather, whether he relied on the hospital to select a particular physician to provide treatment. In support of his conclusion, Dr. York relies on the cases of *McCorry v. Evangelical Hospitals Corp.*, 331 Ill. App. 3d 668, 771 N.E.2d 1067 (2002), and *Scardina v. Alexian Brothers Medical Center*, 308 Ill. App. 3d 359, 719 N.E.2d 1150 (1999).

*Scardina* and *McCorry* found it insignificant that a patient reported to a hospital on the direction of another person. As the *Scardina* court stated:

> "[T]he relevant inquiry here is not whether plaintiff relied on the reputation of [the hospital] in choosing to seek treatment there, but whether plaintiff relied on the holding out of [the hospital] that [the doctor] was its agent or employee when he accepted [the

doctor's] services. Necessarily, one must consider whether the patient in a sense placed himself in the 'hands' of the hospital and looked to it to furnish the medical personnel, including doctors, essential for treatment." *Scardina*, 308 Ill. App. 3d at 365, 719 N.E.2d at 1155.

See also *McCorry*, 331 Ill. App. 3d at 675, 771 N.E.2d at 1071 ("[*Butkiewicz*] focused improperly on the plaintiff's reasons for choosing the hospital, rather than the plaintiff's reasons for accepting treatment from the allegedly negligent physician").

Rush contends that *Butkiewicz* and *James* and *McCorry* and *Scardina* are diametrically opposed to each other and that we must resolve this split of authority. Rush urges us to follow *Butkiewicz* and *James* because they are, allegedly, more true to traditional tort principles surrounding causation. However, we disagree that there is any choice for us to make. In our view, our supreme court has already made the decision for us, in favor of the reasoning of *Scardina* and *McCorry* in *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 622 N.E.2d 788 (1993).

■ *Gilbert* set forth a three-part test for determining whether a hospital may be held liable for an independent doctor working in its facility, requiring that: " '(1) the hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital; (2) where the acts of the agent create the appearance of authority, the plaintiff must also prove that the hospital had knowledge of and acquiesced in them; and (3) the plaintiff acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence.' " *Gilbert*, 156 Ill. 2d at 525, 622 N.E.2d at 795, quoting *Pamperin v. Trinity Memorial Hospital*, 144 Wis. 2d 188, 207-08, 423 N.W.2d 848, 855-56 (1988).

In *Gilbert*, plaintiff's decedent reported to a hospital emergency room with chest pain. He requested treatment from a particular doctor, but that doctor was unavailable; therefore, another doctor, who was an independent contractor, responded to a call from the hospital. The patient had never met the treating doctor before, the authorization he signed did not specify that the treating doctors would be independent contractors, and nobody otherwise informed the patient that the doctor was not a hospital employee. The doctor sent the patient home, having failed to diagnose and treat the severe heart disease that killed him later that day. *Gilbert*, 156 Ill. 2d at 514-17, 622 N.E.2d at 791-92. The circuit court granted summary judgment to the hospital on the grounds that the doctor was not the actual agent or employee of the hospital, but the supreme court reversed. *Gilbert*, 156 Ill. 2d at 517, 622 N.E.2d at 792.

Regarding the natural assumptions and reliance of hospital patients, our supreme court noted:

" 'Absent a situation where the patient is directed by his own physician or where the patient makes an independent selection as to which physicians he will use while there, it is the reputation of the hospital itself upon which he would rely. Also, unless the patient is in some manner put on notice of the independent status of the professionals with whom it might be expected to come into contact, it would be natural for him to assume that these people are employees of the hospital.' " *Gilbert*, 156 Ill. 2d at 521, 622 N.E.2d at 794, quoting *Arthur v. St. Peter's Hospital*, 169 N.J. Super. 575, 583, 405 A.2d 443, 447 (1979).

The court further observed:

" '[T]he critical distinction is whether the plaintiff is seeking care from the hospital itself or whether the plaintiff is looking to the hospital merely as a place for his or her personal physician to provide medical care. Except for one who seeks care from a specific physician, if a person voluntarily enters a hospital without object-ing to his or her admission to the hospital, then that person is seeking care from the hospital itself. An individual who seeks care from a hospital itself, as opposed to care from his or her personal physician, accepts care from the hospital in reliance upon the fact that complete emergency room care—from blood testing to radiological readings to the endless medical support services—will be provided by the hospital through its staff.' " *Gilbert*, 156 Ill. 2d at 525-26, 622 N.E.2d at 796, quoting *Pamperin*, 144 Wis. 2d at 211-12, 423 N.W.2d at 857.

The *Gilbert* court determined that there were material factual issues to be tried surrounding the hospital's holding out of the emergency room doctor and of the decedent's reliance on any such holding out and reversed the summary judgment previously granted to the hospital. *Gilbert*, 156 Ill. 2d at 526, 622 N.E.2d at 796.

However, Rush contends that *Gilbert* must be tempered by the subsequent supreme court opinion in *O'Banner v. McDonald's Corp.*, 173 Ill. 2d 208, 670 N.E.2d 632 (1996). In *O'Banner*, the plaintiff slipped and fell in an independently owned McDonald's restaurant and attempted to recover against the franchising corporation. Explain-ing that the plaintiff "would have to show that he actually did rely on the apparent agency in going to the restaurant where he was allegedly injured," the court rejected his claim, finding that the record before it gave "no indication as to why he went to the restaurant in the first place. The fact that this was a McDonald's may have been completely irrelevant to his decision. For all we know, O'Banner went there simply because it provided the closest bathroom when he needed one or

because some friend asked to meet him there." *O'Banner*, 173 Ill. 2d at 213-14, 670 N.E.2d at 635. Rush argues that, as *Butkiewicz* and *James* held, *O'Banner* requires that for liability to attach to a hospital in a medical malpractice case involving an independent doctor, the plaintiff must prove that a representation of the hospital induced him to come to that hospital in the first instance. We disagree.

As the *McCorry* court noted, those cases that have sought to incorporate the holding of *O'Banner* into the medical malpractice context have analyzed their cases with the wrong focus. *McCorry*, 331 Ill. App. 3d at 675, 771 N.E.2d at 1071 ("'[*Butkiewicz*] focused improperly on the plaintiff's reasons for choosing the hospital, rather than the plaintiff's reasons for accepting treatment from the allegedly negligent physician"). The *McCorry* court reached its conclusion after noting how *Kashishian v. Port*, 167 Wis. 2d 24, 481 N.W.2d 277 (1992), and *Pamperin v. Trinity Hospital*, 144 Wis. 2d 188, 423 N.W.2d 848 (1988), two cases that the *Gilbert* court adopted, handled the issue of a personal physician originally causing a patient to report to a particular hospital. *McCorry*, 331 Ill. App. 3d at 672-74, 771 N.E.2d at 1069-70. As the *Kashishian* court observed, there is nothing "necessarily inconsistent with the hospital having held out specialists and/or consultants as its apparent agents," even while a primary doctor was selected for certain tasks. *Kashishian*, 167 Wis. 2d at 43, 481 N.W.2d at 284; accord *McCorry*, 331 Ill. App. 3d at 675, 771 N.E.2d at 1071 ("'[i]f a plaintiff shows that he relied in part on the hospital when he accepted treatment from an allegedly negligent doctor, he has met the reliance element of the proof"). *Kashishian* further explained that the *Pamperin* court's statement that the patient must not be looking to the hospital only as a place for his primary physician to provide care for the hospital to be liable, only meant to shield hospitals from claims of negligence based on the plaintiff's primary physician's alleged malpractice. *Kashishian*, 167 Wis. 2d at 45, 481 N.W.2d at 285.

■ We agree with *McCorry* that the *Gilbert* court's adoption of *Kashishian* denotes that the law of Illinois is that when a patient relies on a hospital for the provision of support services, even when a physician specifically selected for the performance of a procedure directs the patient to the particular hospital, there may be sufficient reliance for liability to attach to the hospital should the supporting physician commit malpractice. *McCorry*, 331 Ill. App. 3d at 673, 771 N.E.2d at 1070 ("under *Kashishian* and *Pamperin* as adopted in *Gilbert*, the court must determine whether the appearance of agency led to the relationship between plaintiffs and *** the allegedly negligent doctor").

We find no inconsistency between this approach and that presented in *O'Banner* that our supreme court did not already contemplate and

accept. For example, the Illinois Supreme Court Committee on Pattern Jury Instructions in Civil Cases, overseen by our supreme court, highlighted the unique dynamic between doctor and patient in the hospital setting when it explained that its instruction for apparent agency in medical malpractice cases "should not be used without modification where apparent agency is alleged in contexts other than medical negligence," and then cited to *O'Banner*. Illinois Pattern Jury Instructions, Civil, No. 105.10, Notes on Use (Supp. 2003) (hereinafter IPI Civil (Supp. 2003) No. 105.10). That same committee also observed that "a pre-existing physician-patient relationship will not preclude a claim by the patient of reliance upon the hospital." IPI Civil (Supp. 2003) No. 105.10, Comment, citing *Malanowski v. Jabamoni*, 293 Ill. App. 3d 720, 727, 688 N.E.2d 732, 737 (1997).

Defendant contends that this holding would impose liability when the hospital was not a cause in fact of plaintiffs' injuries. We disagree. Unlike the scenario in *O'Banner*, where the plaintiff's contact with the injury-causing instrumentality at the defendant's place of business could have come about through nothing more than mere happenstance, in cases such as this, the plaintiff comes into contact with the injury-causing instrumentality, a negligent doctor, because he relies on the hospital to provide a physician. We further stress that there is no injustice in this imposition of vicarious liability. As the *Gilbert* court pointed out, hospitals advertise themselves as centers for complete medical care and profit when competent service is provided by the independent doctors in their facilities. *Gilbert*, 156 Ill. 2d at 520, 622 N.E.2d at 793, quoting *Kashishian*, 167 Wis. 2d at 38, 481 N.W.2d at 282. Additionally, as pointed out in *Kashishian*, this approach will encourage hospitals to provide better supervision and quality control over the independent physicians working in their facilities. *Kashishian*, 167 Wis. 2d at 45, 481 N.W.2d at 285. Reviewing the verdict against the legal framework presented in *Gilbert*, *Scardina*, and *McCorry*, we find sufficient supporting evidence to sustain the verdict.

Dr. York testified that he did not know that the anesthesiologists at Rush were independent contractors and was unaware of the employment status of the anesthesiologists he had worked with in the past because he was too focused on his own practice. By testifying that his wife handled all the bills, he implied that he never would have seen any bill from University Anesthesiologists for his prior surgery at Rush. Unlike the determinative form signed in *James*, the consent form Dr. York signed nowhere indicated that his physicians would be independent contractors. Additionally, while in a section not directly addressing the administration of anesthesia, the language of the consent providing that Rush could select physicians to assist in the

knee surgery could reasonably be interpreted as allowing Rush to select anesthesiologists. Dr. Jeff York testified that he never discussed the employment status of the attending anesthesiologists at Rush with his father. This evidence supported the conclusion that Dr. York did not know and had no reason to know that Dr. El-Ganzouri was an independent contractor. Again, we recognize that this evidence was not unchallenged. However, as before, the conflicting evidence was itself subject to attack. While an anesthesiologist who was a longtime coworker of Dr. York testified that he was an independent contractor, and that he did not believe that Dr. York could have been unaware of that fact, he also testified that he never explicitly told Dr. York that he was independent of the hospital at which they worked, and also testified that larger, teaching hospitals sometimes directly employed their anesthesiologists.

Besides Rush's failure to inform Dr. York that the anesthesiologists were not its employees, there was also evidence presented to the jury by which it could conclude that Dr. El-Ganzouri was cloaked with authority by the hospital when he treated Dr. York. Dr. El-Ganzouri, like all physicians working at Rush, wore lab coats and/or scrubs with "Rush" and Rush's logo on them. Dr. El-Ganzouri also taught residents in Rush's medical school, such as Dr. Miller, which could suggest a direct employment relationship. From all of this evidence the jury could infer that Dr. York naturally believed that Dr. El-Ganzouri was a hospital employee.

Further, taken in the light most favorable to Dr. York, the jury could have concluded from the evidence presented that he did not know who would serve as his anesthesiologist, instead relying on Rush to provide that physician, and that he was comfortable leaving that decision in Rush's hands because he knew good doctors worked there. Dr. York testified to that effect. Under a favorable construction of the evidence, the jury could also have well believed that Dr. Jeff York did not preselect who would be assigned as his father's anesthesiologist, never requesting that Dr. El-Ganzouri serve in that capacity, as he so testified. Thus, there is also sufficient evidence to show that Dr. York relied on the hospital to choose his anesthesiologist, rendering Rush liable for the malpractice of Dr. El-Ganzouri. Again, we acknowledge that there was conflicting evidence, such as Narbone's testimony that Dr. Jeff York specifically chose Dr. El-Ganzouri to perform the combined spinal epidural, and the psychologist's note addressing Dr. York's anger toward his son for not choosing a better anesthesiologist. However, this contradictory evidence is not so strong as to overwhelm the evidence in favor of Dr. York to the point where no verdict in his favor could ever stand. Narbone could not base his testimony on any

specific, personal recollection, and the psychologist explained her note as demonstrating something other than Dr. York's knowledge that Dr. Jeff York chose his anesthesiologist. Further, while Dr. York's testimony that he always chose his orthopedic surgeon, while potentially allowing the conclusion that he must also have chosen his anesthesiologists for each procedure, does not inescapably, as Rush would suggest, lead to that conclusion. Finally, Dr. Jeff York's original request for Dr. Krolick to serve as the anesthesiologist similarly allows more than one inference surrounding whether Dr. El-Ganzouri was subsequently similarly selected to administer the spinal anesthesia.

Lastly, we note there was some evidence that would even have supported liability under the holdings of *Butkiewicz* and *James*. Dr. York testified that, although he became attached to Dr. Rosenberg, he was first attracted to Rush because of the reputation of the hospital's staff. It was only after developing an interest in Rush that he sought out a particular orthopedic surgeon. Thus, the circuit court properly denied Rush's motions for directed verdict and for judgment notwithstanding the verdict.

Rush further asserts, however, that the provision of an erroneous jury instruction deprived it of a fair trial and tainted the jury's verdict. Whether to provide a particular jury instruction is within the sound discretion of the trial court, and the court's decision will be reversed only in the event of an abuse of that discretion. *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273, 775 N.E.2d 964, 972 (2002). A trial court does not abuse its discretion so long as, "taken as a whole, the instructions fairly, fully, and comprehensively apprised the jury of the relevant legal principles." *Schultz*, 201 Ill. 2d at 273-74, 775 N.E.2d at 972-73.

The trial court admonished the jury using IPI Civil (Supp. 2003) No. 105.10:

"Under certain circumstances, the liability of a party may arise from an act or omission of that party's apparent agent.

In the present case, James York, M.D. and Elizabeth York have sued Rush Presbyterian St. Luke's Medical Center as the principal and Abdel Raouf El-Ganzouri, M.D. as its apparent agent. Rush Presbyterian St. Luke's Medical Center denies that any apparent agency relationship existed.

In order for an apparent relationship to have existed, James York, M.D. and Elizabeth York must prove the following:

First, that Rush Presbyterian St. Luke's Medical Center held itself out as a provider of anesthesia services and that James York, M.D., neither knew nor should have known that Abdel Raouf El-Ganzouri, M.D. was not an employee of Rush Presbyterian St. Luke's Medical Center.

Second, that James York, M.D. did not choose Abdel Raouf El-Ganzouri M.D. but relied upon Rush Presbyterian St. Luke's Medical Center to provide anesthesia services."

Rush's proffered and rejected jury instruction was identical, except for providing that Dr. York must prove that Rush Presbyterian held itself out as a provider of "complete anesthesia services," and that Dr. York "or others" did not choose Dr. El-Ganzouri. Rush's proffered "or others" language derives from the notes to the pattern instruction, which explain that the phrase should be used "where there is evidence that a person or persons other than the plaintiff or the decedent relied upon the principal to provide the medical care under consideration." IPI Civil (Supp. 2003) No. 105.10, Notes on Use. Rush's proposed "complete anesthesia services" comes from an example provided in the pattern form: "First, that [principal's name] held [himself] [herself] [itself] out as a provider of [type of care, *e.g.*, complete emergency room care] ***." IPI Civil (Supp. 2003) No. 105.10.

Rush contends that the instruction, as given, did not accurately reflect the law, which would have required proof that "Rush held itself out as providing—and Dr. York relied on it to provide—*all* of the services, including those of Dr. El-Ganzouri." (Emphasis in original.) Rush also argues that the omission of the "or others" language precluded the jury from considering whether Dr. York relied on Dr. Jeff York, and not Rush, to provide his attending anesthesiologist. We disagree.

To begin, we find that the given instruction adequately informed the jury of the law surrounding Rush's holding out of the relevant anesthesia services. As discussed previously, Dr. York only needed to prove that he relied on Rush for the provision of the medical service and personnel in which and by whom the malpractice was committed. Dr. York did not need to prove that he relied on Rush to provide "*all* of the services." Hence, in this regard, Rush's proposed instruction would misstate the law and could mislead the jury. Rush raises an additional concern that, without the "complete" language, the jury could have concluded that Rush held out Dr. El-Ganzouri as its employee based only on the undisputed fact that its anesthesiology residents were employees. However, we view this as a formalistic, counterintuitive reading of the instruction. In our view, the conjunction in the same paragraph of the necessary holding out by Rush, along with the requirement that Dr. York reasonably lacked knowledge as to Dr. El-Ganzouri's true employment status, makes it clear that the holding out by the hospital at issue is that of Dr. El-Ganzouri.

We likewise do not find the omission of "or others" to constitute an abuse of discretion. Rush did present evidence, direct and

circumstantial, that Dr. York relied on Dr. Jeff York to procure his anesthesiologist, which would have justified the inclusion of the "or others" language in the instruction. However, contrary to Rush's assertion, the jury's consideration of Dr. Jeff York's potential involvement in the choice of anesthesiologists was not precluded under the given instruction. Under that instruction Dr. York had to prove not only that he did not choose Dr. El-Ganzouri to be his anesthesiologist, but also that he, instead, relied on Rush. Under the given instruction, had the jury believed that Dr. York relied on Dr. Jeff York, and not Rush, it still could have returned a finding of no liability. Thus, we find the jury to still have been fairly apprised of the law under the instruction it received. *Schultz*, 201 Ill. 2d at 273-74, 775 N.E.2d at 972-73 (a jury instruction is sufficient so long as it "fairly, fully, and comprehensively apprised the jury of the relevant legal principles").

For all the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

McBRIDE and O'MALLEY, JJ., concur.