THIRD DIVISION
September 29, 2006

Nos. 1-04-3640 and 1-05-0061 cons.

| | | |
|---|---|---|
| ROBERT MOLLER, Individually, and as | ) | Appeal from |
| Executor of the Estate of Hope Moller, | ) | the Circuit Court |
| Deceased, | ) | of Cook County. |
|       Plaintiff-Appellee/Cross-Appellant, | ) | |
| | ) | |
|      v. | ) | No. 00 L 13564 |
| | ) | |
| SERGEI LIPOV and KEY MEDICAL GROUP, | ) | |
| LTD., | ) | Honorable |
| | ) | Tom Chiola, |
|       Defendants-Appellants/Cross-Appellees. | ) | Judge Presiding. |

PRESIDING JUSTICE THEIS delivered the opinion of the court:

This appeal arises from a wrongful death and survival action filed by plaintiff, Robert Moller, individually and as executor of the estate of his wife, Hope Moller, against defendants Sergei Lipov and Key Medical Group, Ltd. Plaintiff alleged that Dr. Lipov negligently failed to timely diagnose, treat, and refer Moller with regard to her breast cancer, and that Key Medical Group, Ltd. was vicariously liable for his negligence. Defendants filed an affirmative defense, raising Moller's comparative fault in failing to follow the treatment recommendations of Dr. Lipov. The jury returned a verdict in plaintiff's favor and awarded $3 million in damages, which was reduced to $1.5 million to reflect the jury's finding that Moller was 50% at fault.

On appeal, defendants contend that: (1) the trial court erred in denying their motions for directed verdict or judgment *n.o.v.* where plaintiff's expert was not qualified and failed to establish that any deviation of the standard of care was a proximate cause of Moller's death; (2)

1-04-3640 and 1-05-0061 cons.

the verdict was against the manifest weight of the evidence; (3) the admission of unfounded causation opinions was reversible error; and (4) counsel's inflammatory closing argument deprived defendants of a fair trial.

On cross-appeal, plaintiff contends that the trial court erred in: (1) denying his motion to strike defendants' affirmative defense of comparative negligence; (2) denying his motion for a directed verdict regarding comparative negligence; and (3) denying his request for costs related to the health professional's report under section 2-622 of the Code of Civil Procedure (the Code) (735 ILCS 5/2-622 (West 2004)). For the following reasons, we affirm the judgment of the circuit court.

BACKGROUND

Hope Moller was 34 years old when she initially established a physician-patient relationship with Dr. Lipov in March 1998 for a thyroid condition. On January 28, 1999, Moller returned to Dr. Lipov, complaining of right breast tenderness and pain in one specific location. Dr. Lipov recorded that Moller had a hard, tender, one-centimeter mass in her right breast and her lymph nodes were negative. He did not record how long the mass had been present, whether it had changed since Moller first noticed it, how it was affected by menstruation, the specific location of the mass, whether Moller was taking birth control or other medications, the mobility or attachment of the mass, signs of infection, the consistency of the mass, or whether there was any dimpling or nipple discharge. Nevertheless, Dr. Lipov testified that it was his custom and practice to consider all of these items during an exam. Dr. Lipov thought that the mass was probably an inflammation of the breast tissue. He scheduled Moller for a mammogram because

1-04-3640 and 1-05-0061 cons.

she was concerned about the mass, and instructed her to administer warm applications to it. His records indicate that he advised her to return to see him in 10 days "if not better, if the lesion gets bigger."

On February 4, 1999, Moller had a mammogram and an ultrasound which revealed two nodules in the right breast; one nodule in the nine o'clock position and the other in the six o'clock position, the area where the mass had been felt. Dr. Patrick Para, the radiologist who interpreted the mammogram and ultrasound, stated that the two nodules were solid, similar in appearance, and most likely related to a benign tumor. Dr. Para stated in his report that if the mass was clinically suspicious, a biopsy was recommended. It was his opinion that had Moller presented with a mass that had been persistent over two menstrual cycles, that fact would have increased the index of suspicion that the mass was cancer and would require a biopsy. Dr. Lipov testified that he had a telephone conversation with Moller on February 5, 1999, the day he received the mammogram and ultrasound results. He informed Moller that the mass was probably benign, but told her that "we need to follow up," and asked her to return if the mass did not get better. His notes indicated that Moller's breast was less tender and that she should return to the clinic if the mass increased in size.

On April 3, 1999, Moller came to see Dr. Lipov complaining of fatigue related to her thyroid condition. Moller did not mention any problems with her breast and Dr. Lipov did not examine her breasts at that visit. He suspected that her symptoms were related to sleep apnea and suggested that she lose weight. He instructed her to return in one month for a follow-up visit.

- 3 -

1-04-3640 and 1-05-0061 cons.

Moller's husband testified that between January and June, he observed Moller examining her breasts and that the pain from the mass continually worsened between February and June, to the point that she could not hug her children or wear a bra. Moller's mother testified that Moller knew how to perform a breast exam and that between February and June 1999, Moller's increasing pain affected her housework, her time with her children, and her ability to wear a bra. During this time period, Moller's mother tried to get Moller to see another doctor.

Moller did not see Dr. Lipov again until June 17, 1999. At that time, she complained of pain in her chest. Dr. Lipov examined her breasts and found that the mass in her right breast had greatly increased in size. It measured 4.5 centimeters. The mass was tender, adherent, and was visibly protruding from the rest of the breast. Dr. Lipov recalls the appointment and recalls asking her why she waited so long to come in and she said, "something to the extent of, I thought it was getting better." Dr. Lipov referred Moller to a surgeon, Dr. Andrew Kramer, who performed a biopsy, which was positive for breast cancer.

Dr. Kramer performed a modified radical mastectomy on Moller on June 25, 1999. During that procedure, he removed her right breast along with 35 lymph nodes. None of the removed lymph nodes contained cancer, and there was no evidence of metastasis. Thereafter, Dr. Aslam S. Zahir administered chemotherapy to Moller from August 1999 to October 1999. In April 2000, Moller had breast reconstructive surgery, but by November 2000, tests results revealed signs that the cancer had spread. Thereafter, Moller was treated by another oncologist, Dr. Melody Cobleigh. By February 2001, Moller's cancer had spread to her lungs and had recurred in the chest wall. She was given chemotherapy to shrink the tumor and prevent further

1-04-3640 and 1-05-0061 cons.

spread of the disease. She ultimately died on July 22, 2001, due to metastatic breast cancer.

Plaintiff's expert, Dr. Arthur Rossof, testified that he is board-certified in internal medicine, oncology and hematology and practices in the subspecialties of oncology and hematology. It was his opinion that Dr. Lipov deviated from the standard of care by failing to obtain a reasonable history, failing to perform a reasonable physical examination, and failing to include Moller's breast problem on a "problem list." Additionally, it was Dr. Rossof's opinion that Dr. Lipov deviated from the standard of care by failing to refer Moller to a surgeon for a biopsy on January 28, 1999, when she presented to Dr. Lipov with the mass, deviated again on February 4, 1999, when he received the mammogram/ultrasound results, and again on April 3, 1999, when Moller presented in his office complaining of fatigue. Dr. Rossof further testified that these negligent acts caused and contributed to the delay in diagnosis of breast cancer, the need for a radical mastectomy rather than a lumpectomy, the spread of cancer, and her ultimate death.

Specifically, Dr. Rossof was critical of Dr. Lipov's care on January 28 because there was nothing in his records to indicate that a proper history was obtained. Dr. Rossof stated that it was important for diagnostic purposes to determine how long the mass had been there and whether it had changed over the course of Moller's menstrual cycle. It was his opinion that had the proper history been taken, Dr. Lipov would have had known that her mass had been there since November or December 1998, unchanged over two menstrual cycles. Given that knowledge, it would have raised Dr. Lipov's index of suspicion for cancer. When asked what the standard of care required in terms of evaluation, Dr. Rossof stated that in addition to the

- 5 -

1-04-3640 and 1-05-0061 cons.

mammogram, Dr. Lipov should have referred her to Dr. Kramer on January 28 for a biopsy.

In addition, Dr. Rossof was critical of Dr. Lipov's care on February 4, 1999, after receiving the results of the mammogram. The results revealed that the mass was a solid lesion which, in his opinion, created another high risk feature, and was therefore clinically suspicious. As a result, given that she had a persistent mass since at least December, Moller should have been reexamined within a relatively short period of time and/or referred to somebody else more familiar with identifying breast cancer at that time for a biopsy. In Dr. Rossof's opinion, it was not enough to tell Moller to come back if the mass got bigger because she was not a skilled observer and Dr. Lipov should not have waited for it to grow. Dr. Rossof also agreed that if the mass had persisted for another month, Moller needed to be referred to a surgeon for a biopsy. A referral should have been made within the month, no later than March 7, 1999.

Further, it was Dr. Rossof's opinion that if the tumor had been removed in January or February of 1999, Moller's cancer would have been over 90% curable. He based his opinion on several factors, including his experience, statistics, the TNM method of staging the cancer, meaning the size of the tumor, the fact that Moller had no known metastatic disease, and no lymph node involvement. Dr. Rossof explained that during January and February, the cancer was a Stage I, referring to the 1.5 centimeter size of the tumor. It was his opinion that over 90% of Stage I cancers are curable regardless of the grade of the tumor. He believed that the cancer could have been a Grade I at that time and later deteriorated to a Grade III. Nevertheless, even if it was a Grade III, meaning that it had all the same negative characteristics it had when it was ultimately diagnosed in June, it was still curable. Additionally, Dr. Rossof stated that had Moller

1-04-3640 and 1-05-0061 cons.

been diagnosed in January or February 1999, a lumpectomy would have been an option due to the smaller size of the tumor and she could have avoided the complications that resulted from the modified radical mastectomy procedure.

Dr. Rossof further testified that the size of the tumor was an important prognostic indicator. Although between February and June 1999 he could not determine the rate of growth, there was definitely growth. It was his opinion that the statistical likelihood of a cure for a Stage II tumor surgically removed, with aggressive treatment, was 75%. As of February 4, Moller's tumor was four millimeters short of being a Stage II cancer, and if it grew four millimeters from February 4 to March 7, he agreed that it would be a Stage II cancer. Stage II cancers range between two centimeters and five centimeters in diameter. It was Dr. Rossof's opinion that, although at Stage II Moller's cancer treatment would have been the same as the treatment given in June, her prognosis would still have been better than it was in June. He explained that even though a tumor of 2.1 centimeters and a tumor of 4.9 centimeters are both Stage II, there can be a difference in the outcome. Chemotherapy given after a 2 centimeter tumor has been surgically removed will have a better outcome than chemotherapy given after a 4.5 centimeter tumor has been removed because a smaller tumor is likely to shed fewer cancer cells than a larger tumor, and there are fewer cells to kill.

Dr. Kramer testified that, in his opinion, the higher the stage and grade of the cancer, the lower the survival rate. Moller had a Grade III cancer cell, which is the most aggressive cell type. It was his opinion that since the cancer was Grade III in June, it would most likely have been Grade III in January and February. He agreed that it would be difficult to determine

- 7 -

1-04-3640 and 1-05-0061 cons.

"whether the grade of cancer plays into its being cured." Moller's particular cancer was resistant to the chemotherapy that she had. It was Dr. Kramer's opinion that if the surgery had been done in February, Moller's particular type of cancer would have been resistant to treatment at that time as well. Nevertheless, he agreed that the cure rate for breast cancer with surgery and chemotherapy is higher for smaller tumors than for larger tumors.

Dr. Zahir testified that the grade of the tumor is very important in the treatment of breast cancer. The higher the grade, the more unpredictable it might be, meaning that the patients can have a higher risk of recurrence. Moller's test results revealed that she had several characteristics indicative of a fast-growing, treatment-resistant cancer, and it was his opinion that these characteristics would have been the same if the cancer was removed in February or March 1999. Dr. Zahir explained that had Moller been diagnosed with cancer in March 1999, he would have administered the same chemotherapy treatment that he administered in August 1999. He further stated that if the tumor comes back within one year of treatment, it is considered to be resistant to treatment from the beginning. Thus, it was his opinion that the treatment would have been ineffective had she had it at an earlier time. With respect to the stage of the cancer, Zahir testified that Moller's tumor was a Stage II in June 1999, no nodes were affected, and there was no metastasis at that time. Therefore, it could be extrapolated that no nodes would have been affected and there was no metastasis in February 1999.

Dr. Cobleigh opined that there is debate about whether the grade of the tumor has any independent prognostic significance beyond the size of the tumor and the lymph node status. In her opinion, lymph node status and the size of the tumor are the most important prognostic

- 8 -

factors.

Defense expert Dr. Jeffrey Kopin testified that he is board-certified in internal medicine and has practiced in that area for 17 years. It was his opinion that Dr. Lipov complied with the standard of care on January 28 by taking Moller's history, giving her a physical exam, ordering a mammogram, and giving her appropriate follow-up instructions. She had no high risk factors for cancer, she was young, and had no family history of breast cancer. In his opinion, nothing about her presentation was clinically suspicious.

Additionally, Dr. Kopin testified that Dr. Lipov complied with the standard of care on February 5 by telling her the results of the mammogram and ultrasound and instructing her to return if the mass got bigger. She was the one who found the mass in the first instance and, therefore, could appreciate a change. In Dr. Kopin's opinion, there was no reason to set an appointment for a date certain to return because, according to the tests, these were benign masses and the patient reported a decrease in tenderness, which would indicate she was getting better. Additionally, he stated that it was very unusual for two masses to appear on an ultrasound as cancer. It was Dr. Kopin's opinion that there was no clinical suspicion of cancer at this time. Dr. Kopin agreed that if the mass had persisted unchanged for two menstrual cycles, that would make the mass possibly more suspicious. Nevertheless, it was his opinion that even if she had a persistent mass, it would be reasonable to have her come back after another menstrual cycle to reexamine the mass or it would be reasonable to chose instead to order a mammogram and ultrasound, which is ultimately what was ordered.

Furthermore, Dr. Kopin testified that Dr. Lipov complied with the standard of care on

April 3. It was Kopin's opinion that Moller presented to Dr. Lipov with a specific problem related to her thyroid, he addressed that problem, and he was not required to examine her breast on that date. As far as Dr. Lipov was concerned, after the testing and instructions he gave her, that issue was resolved. There was no evidence in the record that Moller ever called Dr. Lipov to report a painful breast mass.

Defense expert Dr. William Gradishar testified as a board-certified oncologist regarding causation. It was his opinion that Moller's death was related to the specific biology and clinical course of her disease, and that the outcome likely would have been the same even if she had been referred to a surgeon for a biopsy as early as November or December 1998. Dr. Gradishar based his opinion on the characteristics of Moller's tumor as well as her age, which all led to a poor prognosis. It was his opinion that these characteristics would more likely than not have been the same had the tumor been removed as early as December 1998. He did not necessarily agree with the opinion that the smaller the tumor, the more responsive it is to chemotherapy. Rather, in Gradishar's opinion, the characteristics of the tumor and the biology of the disease dictate whether the patient will respond to therapy. Nevertheless, he agreed that the two most important factors in determining prognosis are the size of the primary tumor and the presence or absence of lymph node involvement.

At the close of the case, the jury returned a verdict in favor of plaintiff in the amount of $3 million, but the verdict was reduced by 50% for a total of $1.5 million due to the jury's finding that Moller was contributorily negligent. Defendants filed a timely notice of appeal, plaintiff filed a cross-appeal, and this court granted defendants' motion to consolidate the two

1-04-3640 and 1-05-0061 cons.

appeals.

ANALYSIS

Defendants contend that the trial court erred in denying their motions for a directed verdict and for judgment *n.o.v.* or in the alternative a new trial. We begin our review of defendants' claims by setting forth the standards for granting each of these forms of relief.

"[V]erdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [a] movant that no contrary verdict based on that evidence could ever stand." Pedrick v. Peoria & Eastern R.R. Co., 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967). Because the standard for entry of judgment *n.o.v.* is high, judgment *n.o.v.* is inappropriate if " 'reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented.' " York v. Rush-Presbyterian-St. Luke's Medical Center, No. 99507, slip op. at 25 (June 22, 2006), quoting Pasquale v. Speed Products Engineering, 166 Ill. 2d 337, 351, 654 N.E.2d 1365, 1374 (1995). "In making this assessment, a reviewing court must not substitute its judgment for the jury's, nor may a reviewing court reweigh the evidence or determine the credibility of the witnesses." Donaldson v. Central Illinois Public Service Co., 199 Ill. 2d 63, 89, 767 N.E.2d 314, 331 (2002). We apply a *de novo* standard of review to the trial court's denial of a motion for directed verdict as well as its denial of a motion for judgment *n.o.v.* Donaldson, 199 Ill. 2d at 89, 767 N.E.2d at 330; Gathings v. Muscadin, 318 Ill. App. 3d 1091, 1093, 743 N.E.2d 659, 660 (2001).

A new trial should be granted only when the verdict is contrary to the manifest weight of

- 11 -

the evidence. York, slip op. at 25. A verdict is contrary to the manifest weight of the evidence when the opposite conclusion is clearly evident or when the jury's findings are unreasonable, arbitrary and not based upon any of the evidence. York, slip op. at 25. A reviewing court will not reverse a circuit court's decision with respect to a motion for a new trial unless it finds that the circuit court abused its discretion. York, slip op. at 25.

With this procedural framework in mind, we turn to the merits of the appeal. Defendants argue that Dr. Rossof lacked the requisite qualifications to render opinions in this case. Initially, we note that defendants never filed a motion *in limine* regarding his qualifications, never objected to his qualifications during trial, and never raised this issue in their motion for directed verdict. Dr. Rossof's qualifications were raised for the first time in defendants' posttrial motion. "[A] 'party cannot sit on his hands and let perceived errors into the record and complain of those errors for the first time in a post-trial motion.' " Taluzek v. Illinois Central Gulf R.R. Co., 255 Ill. App. 3d 72, 82, 626 N.E.2d 1367, 1375 (1993), quoting Pharr v. Chicago Transit Authority, 220 Ill. App. 3d 509, 515, 581 N.E.2d 162, 166 (1991).

A primary purpose of the waiver rule is to ensure that the trial court has the opportunity to correct the error. York v. El-Ganzouri, 353 Ill. App. 3d 1, 10, 817 N.E.2d 1179, 1188 (2004). A trial court cannot correct the error and prevent prejudice when the objection is not made as the error occurs. York, 353 Ill. App. 3d at 10, 817 N.E.2d at 1188. This purpose is especially relevant here where the trial court was never asked to determine whether Dr. Rossof met the foundational requirements to testify.

Moreover, we note that prior to trial, defendants filed a motion *in limine* to bar plaintiff's

1-04-3640 and 1-05-0061 cons.

other retained expert because his testimony was duplicative of the testimony of Dr. Rossof. Had Dr. Rossof's qualifications been objected to at that time, plaintiff would have had an opportunity to present his other retained expert. Accordingly, where the record reveals that defendants failed to object to Dr. Rossof's qualifications at trial, we find this issue has been forfeited on appeal. Snelson v. Kamm, 204 Ill. 2d 1, 25, 787 N.E.2d 796, 809 (2003); Mundell v. La Pata, 263 Ill. App. 3d 28, 33, 635 N.E.2d 933, 938 (1994).

We next address defendants' contentions regarding causation. Specifically, defendants argue that Dr. Rossof's testimony left a "fatal gap" between the conduct he claimed fell outside the standard of care and the conduct that caused or contributed to Moller's death. In a medical negligence case, the plaintiff must establish that it is more probably true than not true that the defendant's negligence was a proximate cause of the injury. Borowski v. Von Solbrig, 60 Ill. 2d 418, 424, 328 N.E.2d 301, 305 (1975). The proximate cause element of a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty. Northern Trust Co. v. University of Chicago Hospitals & Clinics, 355 Ill. App. 3d 230, 242, 821 N.E.2d 757, 768 (2004).

Here, defendants direct our attention to Dr. Rossof's testimony that the outside limit of the standard of care would have permitted Dr. Lipov to wait until March 7, 1999, to refer Moller for a biopsy. At that time, Dr. Rossof agreed the cancer would have likely been at Stage II, and Dr. Rossof could not state to a reasonable degree of medical certainty whether it was possible that the tumor was curable only a few weeks later by the April 3 visit.

Although we recognize that Dr. Rossof gave conflicting testimony regarding the standard

of care, we do not find a "fatal gap" in the evidence. There was some evidence in the record, taken in the light most favorable to the plaintiff, to support the jury's findings that defendants were negligent and that negligence proximately caused or contributed to cause Moller's injuries. In addition, we hold that the circuit court did not abuse its discretion in denying defendants' motion for a new trial on this basis.

Dr. Rossof testified that Dr. Lipov deviated from the standard of care by failing to take a complete history of Moller when she presented on January 28, 1999. Had he taken the requisite history, he would have known that this mass had persisted over two menstrual cycles, which was a sign that the mass was clinically suspicious. Both Dr. Para and Dr. Kopin agreed that such a persistent mass could raise the index of clinical suspicion. In addition, Dr. Rossof stated that the results of the mammogram on February 4 revealed that the nodule was solid, another sign that the mass was suspicious for cancer. Given these two indicators, and given Dr. Para's report that the mass should be investigated further if clinically suspicious, Dr. Rossof stated that Dr. Lipov deviated from the standard of care by failing to refer Moller for a biopsy by February 4 or shortly thereafter.

It was Dr. Rossof's further opinion that had Moller been diagnosed by February 4 or shortly thereafter, the 1.5 centimeter mass would have been curable regardless of the grade of the tumor because it was a Stage I cancer, there was no nodal involvement, and there was no sign of metastasis. While the negative Grade III characteristics of the tumor were present in June, it was his opinion that they may not have been present yet in January and February. Dr. Cobleigh agreed that there was a debate about what role the grade of cancer plays in prognosis. Both Dr.

Cobleigh and Dr. Gradishar agreed that the two most important factors in determining prognosis are the size of the tumor and the nodal involvement.

Even if it was a Stage II cancer, Dr. Rossof testified that an earlier detected Stage II cancer had a better prognosis than a late Stage II cancer because there would be fewer shedding cells and fewer cells to kill. Accordingly, had Moller been referred on February 4 or shortly thereafter, she would have had a better chance of survival than she did when the cancer was diagnosed at 4.5 centimeters in June. This testimony was also supported by Dr. Zahir's testimony that the bigger the tumor, the higher the chances of it spreading, and Dr. Kramer's testimony that the cure rate is higher for smaller tumors.

Considering the entirety of the evidence, viewed in its aspect most favorable to the plaintiff, it cannot be said that there was a "fatal gap" or that all of the evidence so overwhelmingly favored defendants that no contrary verdict based on that evidence could ever stand. Similarly, based upon the evidence adduced at trial, we cannot say that the jury's verdict was contrary to the manifest weight of the evidence. The opposite conclusion was not clearly evident, the jury's findings were neither unreasonable nor arbitrary, and the findings of the jury were based upon the evidence. Accordingly, the circuit court did not abuse its discretion in denying defendants' motion for a new trial.

Defendants also argue that Dr. Rossof's opinions should have been disregarded because they lacked the necessary basis to give them any probative value and were merely based on his "experience." The basis for an expert's opinion goes to the weight of the evidence, not to its sufficiency, and the weight to be assigned to an expert opinion is for the jury to determine in

1-04-3640 and 1-05-0061 cons.

light of the expert's credentials and the factual basis of his opinion. Snelson, 204 Ill. 2d at 26-27, 787 N.E.2d at 810. An expert may give an opinion without disclosing the underlying facts or data. Rather, the burden is placed upon the adverse party during cross-examination to elicit the facts underlying the expert opinion. Snelson, 204 Ill. 2d at 27, 787 N.E.2d at 810.

Here, Dr. Rossof based his opinions upon Dr. Lipov's medical records, Dr. Para's mammogram/ultrasound results, his own experience in the field of oncology, and the TNM method for determining the prognosis of cancer patients, referring to the size of the tumor (T), the lymph node characteristics (N), and the presence or absence of distant metastasis (M). Defendants conducted a vigorous cross-examination of Dr. Rossof, challenging the bases and soundness of his opinions and debating the role that biology and grade of tumor play in determining prognosis. Thus, defendants attempted to reveal deficiencies in Dr. Rossof's testimony, and it was ultimately up to the jury to determine the weight to be given the conflicting testimony. Accordingly, for all of the foregoing reasons, the trial court did not err in denying the motion for directed verdict or motion for judgment *n.o.v.* based upon unfounded causation opinions. Nor do we find that the trial court abused its discretion in denying defendants' motion for a new trial on that basis.

We next address defendants' contention that plaintiff's closing argument deprived them of a fair trial when plaintiff's counsel analogized Dr. Lipov's conduct to a driver who ignores a stop sign, then waves the pedestrian into the intersection, drives over her and then comes back and drives over her again. Initially, we note that in order to properly preserve an issue for appeal, a party must both make a contemporaneous objection and raise the issue in a posttrial

- 16 -

motion. <u>Kim v. Evanston Hospital</u>, 240 Ill. App. 3d 881, 892, 608 N.E.2d 371, 378 (1992). Since defendants failed to make a contemporaneous objection to the alleged improper argument to allow the trial court an opportunity to apply its discretion and provide a curative instruction to any alleged impropriety, we find the issue has been waived.

Waiver aside, we find no reversible error. "Improper argument may be a basis for reversal if the argument was of such a character as to have prevented the party from receiving a fair trial." <u>Myers v. Heritage Enterprises, Inc.</u>, 354 Ill. App. 3d 241, 249-50, 820 N.E.2d 604, 612 (2004). Whether a party has been denied his right to a fair trial requires a consideration of the entire trial. <u>Myers</u>, 354 Ill. App. 3d at 250, 820 N.E.2d at 612. Our review of these remarks in the context of the entire trial reveals nothing so prejudicial as to deprive defendants of a fair trial.

We next consider plaintiff's cross-appeal. Plaintiff initially contends that trial court erred in denying his motion to strike defendants' affirmative defense of comparative negligence because they failed to sufficiently plead the elements of the defense. Initially, we find plaintiff has waived review of this issue for failure to file a posttrial motion. Waiver aside, we find no error. Section 2-613(d) of the Code requires that facts constituting any affirmative defense be plainly set forth in the answer. 735 ILCS 5/2-613(d) (West 2004). Section 2-613 is designed to prevent unfair surprise at trial. <u>Holladay v. Boyd</u>, 285 Ill. App. 3d 1006, 1011-12, 675 N.E.2d 262, 266 (1996). In their affirmative defense, defendants alleged that "the failure of [Moller] to follow the treatment recommendations of [Dr. Lipov] and Key Medical Group contributed in whole or in part and proximately caused the alleged injuries and damages of which plaintiff

1-04-3640 and 1-05-0061 cons.

complains." We find that this affirmative defense contained sufficient information to inform plaintiff of the defense he would be called upon to address and there is no indication that plaintiff was indeed unprepared or surprised at trial.

Plaintiff next contends that the trial court erred in denying his motion for a directed verdict on the issue of comparative fault. Section 2-1202 of the Code specifically provides that if the court denies a motion for directed verdict, the motion is waived unless the request is renewed in a posttrial motion. 735 ILCS 5/2-1202 (West 2004). Accordingly, plaintiff has also waived this issue for review by failing to file a posttrial motion. Nevertheless, even were we to address the merits, we would find that there was sufficient evidence in the record to defeat plaintiff's motion.

The evidence, taken in the light most favorable to the defense, was that Dr. Lipov instructed Moller to return to see him if her mass grew or if her pain increased. Both her husband and mother testified that during January and February, Moller regularly examined her breasts and that the pain from the mass continually worsened between February and June. Moller did not return to see Dr. Lipov regarding her breast condition until June 17, 1999. Accordingly, there was some evidence to support Moller's contributory negligence in that had she continued to experience pain after her mammogram and ultrasound, she should have followed Dr. Lipov's instructions to inform him of that fact. Had she done so, Dr. Lipov could have referred her at a point where Dr. Rossof believed she would have still been curable.

Plaintiff next contends that the trial court erred in denying his request for costs related to the healthcare professional's report under section 2-622 of the Code. 735 ILCS 5/2-622 (West

- 18 -

1-04-3640 and 1-05-0061 cons.

2004). Specifically, plaintiff argues that since the healthcare professional's report is a necessary cost required by statute in order to file a medical negligence action, the cost of the report should be recoverable. Whether the trial court has the authority to award such costs is an issue of first impression, and because it is a question of law, we apply *de novo* review. Vincencio v. Lincoln-Way Builders, Inc., 204 Ill. 2d 295, 299, 789 N.E.2d 290, 293 (2003).

The prevailing plaintiff's recovery of costs has been authorized by statute in Illinois. Section 5-108 of the Code provides as follows:

"If any person sues in any court of this state in any action for damages personal to the plaintiff, and recovers in such action, then judgment shall be entered in favor of the plaintiff to recover costs against the defendant, to be taxed, and the same shall be recovered and enforced as other judgments for the payment of money, except in the cases hereinafter provided." 735 ILCS 5/5-108 (West 2004).

Although the provision entitling plaintiff to costs is mandatory, the mandate must be narrowly construed as statutes allowing recovery of costs are in derogation of the common law. Vincencio, 204 Ill. 2d at 300, 789 N.E.2d at 293.

In Galowich v. Beech Aircraft Corp., 92 Ill. 2d 157, 165, 441 N.E.2d 318, 321 (1982), our supreme court stated that the term "costs" has acquired "a fixed and technical meaning in the law." The Galowich court defined costs as "allowances in the nature of incidental damages awarded by law to reimburse the prevailing party, to some extent at least, for the expenses necessarily incurred in the assertion of his rights in court." Galowich, 92 Ill. 2d at 165-66, 441

- 19 -

1-04-3640 and 1-05-0061 cons.

N.E.2d at 321. Nevertheless, in <u>Vincencio</u>, the supreme court explained that this definition is merely descriptive, not prescriptive, meaning that it describes a characteristic shared by all categories of taxable costs, but "it does not prescribe a rule that draws a line between those that must be taxed pursuant to section 5-108 and those that may be taxed pursuant to another statute or rule." <u>Vincencio</u>, 204 Ill. 2d at 301-02, 789 N.E.2d at 294.

For example, the <u>Vincencio</u> court stated that merely because a corporation may only appear through counsel and, therefore, incurs attorney fees every time it asserts its rights in court, does not mean that these fees are taxable costs under section 5-108. <u>Vincencio</u>, 204 Ill. 2d at 302, 789 N.E.2d at 294. Thus, by analogy, it can also be said that, merely because a plaintiff must pay a fee for a healthcare professional's report in order to assert his rights in a medical malpractice case, it does not necessarily follow that it is a mandated taxable cost under section 5-108.

Rather, in defining costs under section 5-108, the <u>Vincencio</u> court relied upon the distinction between costs commonly understood to be "court costs," such as filing fees, subpoena fees, and statutory witness fees, all of which would be undisputed as taxable costs, and "litigation costs," which are the ordinary expenses and burdens of litigation. These costs are not recoverable unless otherwise authorized by another statute or supreme court rule. <u>Vincencio</u>, 204 Ill. 2d at 302, 789 N.E.2d at 295.

Applying this distinction to the present case, the fee for the healthcare professional's report does not fall squarely within the commonly understood "court costs" which are mandated by section 5-108. Mindful of our duty to construe the statute narrowly, we refuse to expand the

- 20 -

definition of court costs, and thus, hold that section 5-108 does not authorize the taxing of costs related to fees incurred for a healthcare professional's report under section 2-622. Additionally, plaintiff does not argue that any other statute or rule would authorize such fees as taxable costs.

For all of the foregoing reasons, we affirm the judgment of the circuit court.

No. 1-04-3640, Affirmed.

No. 1-05-0061, Affirmed.

GREIMAN and KARNEZIS, JJ., concur.

# REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT
_____

ROBERT MOLLER, Individually, and as Executor of the Estate of HOPE MOLLER, Deceased,

      Plaintiff-Appellee/Cross-Appellant,

      v.

SERGEI LIPOV and KEY MEDICAL GROUP, LTD.,

      Defendants-Appellants/Cross-Appellees,

_____

### Nos. 1-04-3640 and 1-05-0061 cons.

**Appellate Court of Illinois**
**First District, Third Division**

**Filed: September 29, 2006**
_____

### PRESIDING JUSTICE THEIS delivered the opinion of the court.

**Greiman and Karnezis, JJ., concur.**
_____

**Appeal from the Circuit Court of Cook County**
**Honorable Tom Chiola, Judge Presiding**
_____

| For PLAINTIFF-APPELLEE/CROSS-APPELLANT | Anne M. Oldenburg<br>Melvin G. Hobbs<br>Alhom, Monahan, Klauke,<br>Hay & Oldenburg, L.L.C.<br>221 N. LaSalle St., Suite 450<br>Chicago, IL 60601 | Hugh C. Griffin<br>Elsa Y. Trujillo<br>Lord, Bissell & Brook LLP<br>115 S. LaSalle St.<br>Chicago, IL 60603<br><br>Samuel J. Leib<br>Leib & Katt, S.C.<br>740 N. Plankinton Ave., Suite 600<br>Milwaukee, WI 53203 |

For DEFENDANTS-APPELLANTS/CROSS-APPELLEES

Kenneth C. Chessick
John W. Fisk
Travis W. Life
Matthew R. Hess
Magdalena Dworak
Stuart E. Card
The Law Offices of Kenneth C. Chessick, M.D.
1870 N. Roselle Rd., Suite 104

Schaumburg, IL 60195